[Crim. No. 19612. Second Dist., Div. Two. Sept. 21, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
LLOYD JOHNSON, Defendant and Appellant.

170

Richard S. Buckley, Public Defender, Harold E. Shabo, Irwin H. Garfinkel and Harry W. Brainard, Deputy Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and John R. Evans, Deputy Attorney General, for Plaintiff and Respondent.

**HERNDON, J.—**

### Statement of the Case

The record in this robbery and murder case is a saddening chronicle of multiple human tragedies resulting from the commission of criminal acts of almost unbelievable cruelty. Two elderly people died and four others

suffered serious injuries as the result of the senseless and brutal beatings inflicted upon them by Lloyd Johnson, the appellant herein, and by his two partners in crime named Anderson and Dennis.

There is no question of guilt in this case. The only question presented is whether the trial court erred in admitting evidence of appellant's incriminating statements which amounted in effect to a confession. Appellant argues that his confession was inadmissible because it was the product of impermissible police interrogation renewed after he had invoked his right to counsel. We have concluded that the evidence supports the trial court's finding that appellant's incriminating statements were freely volunteered and were not the result of either physical or psychological pressure, coercion, duress or undue influence. It follows that the judgment convicting appellant of first degree murder and of first degree robbery entered upon the verdict of the jury should be affirmed.

### Summary of the Facts

Julius Stamm, age 91, lived with his 84-year-old wife Irene in their single family residence in Los Angeles. On the night of December 20, 1969, they were at home alone watching television when at about 1 a.m. they heard the sounds of crashing glass emanating from their kitchen.

Mr. Stamm went to the kitchen where he was confronted by the three Negroes who had broken in. In response to their demand for money, Mr. Stamm gave them $8 or $10 from a water pitcher. Appellant thereupon rewarded Mr. Stamm by striking him on the head with the pitcher, administering a blow so violent that the aged victim was "floored."

Cesar B. Monoz lived next door to the Stamms. About 1 a.m. on December 20, 1969, he heard a sound of shattering glass and footsteps in the Stamm residence. He walked over to the Stamm house with his father about five minutes later and found the back screen door torn open, the window broken, and the service door broken. When he entered he found Mr. Stamm lying on the floor bleeding with a gash on his forehead and a cut on his neck. A broken pitcher was observed in the sink. Mrs. Stamm was found in the hall adjoining the kitchen. She was seated, huddled against one of the walls, and was in an excited and shocked condition. She said three men had kicked and beaten her.

The Stamms were transported to the hospital where Mrs. Stamm was treated for a laceration of the scalp, her heart was irregular or fibrillating and her condition was very poor. Mr. Stamm was treated for a laceration of the skull, contusions and abrasions all over the body, fractured right elbow and possible skull fracture.

172

Mrs. Stamm died on January 22, 1970. In the opinion of the senior deputy coroner who performed the autopsy, the beating Mrs. Stamm suffered on December 20, 1969, was a causal factor in her death. The jury so found.

Mr. Stamm died on May 2, 1970. The deputy medical examiner who performed the autopsy was of the opinion that the cause of death was acute and chronic peritonitis due to perforation of the small intestine, in turn due to blunt force trauma. A severe blow with a fist or a foot suffered on December 20, 1969, could have caused the death.

On January 17, 1970, Mr. and Mrs. Herbert Bair, Mr. and Mrs. Henderson, and Ruth Peterson were at the home of Mr. and Mrs. Clyde Schick in Los Angeles. Around 9 p.m. the doorbell rang and Mrs. Schick answered it. A tall colored man asked for a certain party, and Mrs. Schick said no one with that name was there and closed the door. About 10 p.m. the man returned and said he was coming in. Mrs. Schick ordered him off her property. The three or four other colored men on the porch began pushing the door. Mrs. Schick called for her husband. Mr. Schick and Mr. Bair tried to push the door closed. Appellant was one of the men at the door who had knives. He said, "Open the door or you are a dead man."

The door was forced open and Mr. Bair fell backward. One of the men pushed him into a chair and held a knife to his groin. Mr. Bair gave him money. Mrs. Schick ran to the phone but one of the men followed her and pulled the phone out of the wall. He cut her on the forehead and abdomen. Mrs. Henderson was cut on the arm. The men took $40 and a watch from Mr. Schick, a wallet and eyeglass case from Mrs. Schick's purse, a table radio and Mrs. Henderson's fur stole.

It was stipulated that appellant was arrested on February 3, 1970, and that his arrest was made with probable cause. He was subsequently charged with five counts of robbery and with the murders of Julius and Irene Stamm.

Prior to the commencement of the jury trial appellant made a motion characterized by his counsel as a common law motion to determine the admissibility of appellant's self-incriminating statements. The testimony received at the hearing on that motion was as follows:

At about 7 p.m. on February 3, 1970, after appellant had been arrested, Officer Barry and Sergeant Helvin of the Los Angeles Police Department had a conversation with him at the police station. Sergeant Helvin first advised appellant of his constitutional rights. He was asked if he understood his rights and he replied that he did. He was asked if he wished to talk to the police and he replied that he did. He was then asked if he

desired the services of an attorney and he replied in the affirmative. Officer Barry thereupon advised appellant of the charges against him and terminated the interview.

On the following morning at approximately 10 a.m., Officer Barry met with appellant in an interview room in the jail for the purpose of completing a routine police report which Officer Barry testified was required with respect to each felony arrestee. Appellant was brought to the interview room by a jailer. No one was present other than Officer Barry and appellant.

The report, entitled "Investigator's Final Report," also known as the "five-ten form," contained boxes for the following information: name, booking number, DR No., LA number, alias, occupation and place of employment, marital status, and credit references. It also contained blanks to indicate whether the arrestee was on relief or belonged to a union, whether he was armed when arrested, family history, personal friends, and personal history. There were also places for information as to whether evidence was booked, where the arrestee was booked, whether a complaint was filed, and final disposition. One purpose of this form is to obtain information about the stability of the arrestee to be used in determining bail and in finding a prisoner who jumps bail.

Officer Barry filled in part of the form from other sources, and part from his interview with appellant. Information received directly from appellant included alias, vehicle description, occupational status, relief status, union membership, marital status, credit references, names of relatives and associates, and personal history such as birth, education, work habits and present residence.

Officer Barry testified that some of the information required by the form could not be obtained from sources other than the arrestee. Information from other sources relative to certain of the matters would be quite inaccurate or only a guess. Such matters as occupation, credit rating, habits and friends might have changed. Some information, although possibly available elsewhere, would not be as accurate as that given by the arrestee personally.

After completing this form Officer Barry got up to leave. He had opened the door and was walking through the door when he looked over his shoulder at appellant and said, "Last night you thought we were kidding, but today you are booked for murder." Almost immediately appellant said, "Wait a minute," and then proceeded to make the statements in question.

On the basis of the foregoing testimony, the trial court expressly found that "[T]he statements were free and voluntary and not a result of either physical or psychological pressure, coercion, duress or undue influence." In denying appellant's motion to suppress the statements, the trial court further found "that the statements were not the result of custodial interrogation, and when the defendant said in his first statement, 'Wait a minute,' this would indicate even more a clear intent on his part to change his mind and to speak even though he knew that he did not have to, and he had a right to see an attorney before he made any statements. . . . [T]he statements, being free and voluntary, are admissible."

Appellant's statements relating to the occurrence at the Stamm residence as recorded by the officer were as follows: "Me and James Dennis and James Anderson. . . . James Dennis broke the window and opened the door. We ran in. Dennis hollered, 'We're the police.' He went in the room where the old lady was. I asked the man where the money was; he said it was in a cookie jar. I got some change out of the jar. I heard some noise in the other room where James Dennis and the old lady were. It sounded like some—it sounded like some [*sic*] was falling. Me and James Anderson were still together in the kitchen. Then I went outside; then James Anderson come out about 10 seconds later. We went down the street and waited on James Dennis. One or two minutes later here he come. I didn't hurt anybody."

Appellant's statements concerning the robbery at the Schick residence were as follows: "Kenny or James knocked on the door. They were all crowded up on the porch. Then I saw them go in. I was down the street because I saw a woman looking out her window. I was the last one to go in. I don't know who hit the old lady and stabbed her. I ran in a room and saw an old lady on the floor. Then I ran back to the room where everybody else was. I started to run upstairs, but I saw everybody running out, so I tried to get out. The old man was trying to lock the door, and I grabbed it and ran out. I took the fur coat off the chair. I left the coat at James Dennis' house. He said he would get a sale for it and would give me half of the money. I didn't touch nobody."

> *Appellant's Incriminating Statements Were Voluntary and Were Not the Product of Police Custodial Interrogation or of Coercion, Either Physical or Psychological, and Were Therefore Admissible.*

As we have indicated, it was appellant's contention in the trial court, and it is his contention here, that the self-incriminating statements which he made to Officer Barry on February 4, 1970, were inadmissible

because they were the product of impermissible police interrogation. He argues that the principles enunciated in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], dictate that once he had indicated his desire to be represented by counsel, no statement subsequently made by him in the absence of counsel could be used against him.

We hold, however, that the record supports the trial court's finding that the statements in question were not elicited by any form of interrogation but were volunteered. The information required by the routine form had nothing to do with the circumstances surrounding the offenses with which appellant was charged. ■ The obtaining of such routine information from prisoners does not amount to impermissible interrogation. Such information is necessary to proper administration and in some respects it serves purposes beneficial to the prisoner. (*People* v. *Walters,* 252 Cal. App.2d 336, 338 [60 Cal.Rptr. 374]; *People* v. *Hernandez,* 263 Cal. App.2d 242, 253-254 [69 Cal.Rptr. 448]; *People* v. *Propp,* 235 Cal. App.2d 619, 643 [45 Cal.Rptr. 690].)

■ Notwithstanding an initial assertion of the right to remain silent, a statement subsequently made by a defendant in custody is admissible if it was volunteered upon the defendant's own initiative and was not made in response to interrogation by the police. (*People* v. *Carroll,* 4 Cal.App.3d 52, 57 [84 Cal.Rptr. 60]; *People* v. *Daniels,* 1 Cal.App.3d 367, 373 [81 Cal.Rptr. 675]; *People* v. *Randall,* 1 Cal.3d 948, 956, fn. 7 [83 Cal.Rptr. 658, 464 P.2d 114]; *People* v. *Sunday,* 275 Cal.App.2d 473, 481 [79 Cal. Rptr. 752].)

■ Appellant cannot complain about the procedure followed by the officer in the filling out of the form because no information gained thereby was introduced against him at the trial. ■ Even in a case where there has been impermissible interrogation, it provides no ground for a reversal of the judgment if no evidence procured thereby is introduced at trial. (*United States* v. *Blue,* 384 U.S. 251 [16 L.Ed.2d 510, 86 S.Ct. 1416]; *In re Pike,* 66 Cal.2d 170, 173-174 [57 Cal.Rptr. 172, 424 P.2d 724]; *People* v. *Duke,* 276 Cal.App.2d 630, 637 [81 Cal.Rptr. 69].)

■ As the trial court found, the interview had terminated and Officer Barry was leaving the room when he made the parting statement, "Last night you thought we were kidding, but today you are booked for murder." Obviously it was not in response to any question that appellant called out, "Wait a minute," and then proceeded to make his voluntary statements.

■ There is nothing improper in informing a defendant of the charges

against him. It cannot reasonably be construed as an impermissible attempt to change the defendant's mind about waiving his *Miranda* rights. (*People* v. *Sunday, supra,* 275 Cal.App.2d 473, 480-481; see *People* v. *Schwartzman,* 266 Cal.App.2d 870, 884-885 [72 Cal.Rptr. 616]. See also, *People* v. *Long,* 6 Cal.App.3d 741, 746-748 [86 Cal.Rptr. 227]; *People* v. *Robinson,* 274 Cal.App.2d 514, 520-521 [79 Cal.Rptr. 213].) To state the charges without asking questions is not interrogation. (See *People* v. *Ross,* 236 Cal.App.2d 364, 372-373 [46 Cal.Rptr. 41].) ▇ The statement was made simply as a comment in passing while leaving the room. (See *People* v. *Spearman,* 1 Cal.App.3d 898, 905 [82 Cal.Rptr. 277].) Thus, it was not interrogation.

Appellant also contends that this statement by the officer was "psychological coercion" which "intimidated" appellant into waiving his *Miranda* rights. The argument that informing a defendant of the charges or evidence against him constitutes trickery or cajolery has been rejected. (*People* v. *Butler,* 12 Cal.App.3d 189, 192-193 [90 Cal.Rptr. 497]; *People* v. *Hunter,* 252 Cal.App.2d 472, 478 [60 Cal.Rptr. 563]; *People* v. *Shaw,* 267 Cal. App.2d 679, 681-682 [73 Cal.Rptr. 499].) Apparently appellant had not previously been informed that he had been booked for murder. Thus, the officer actually gave appellant information to which he was entitled.

▇ The trial court's finding that appellant's statements were voluntary and uncoerced and were not the product of police interrogation, should be upheld unless palpably erroneous. (*People* v. *Daniels, supra,* 1 Cal. App.3d 367, 374; *People* v. *Long, supra,* 6 Cal.App.3d 741, 747; *People* v. *Brockman,* 2 Cal.App.3d 1002, 1008 [83 Cal.Rptr. 70]; *People* v. *Brashier,* 271 Cal.App.2d 298, 304 [76 Cal.Rptr. 581].)

The judgment is affirmed.

Roth, P. J., and Fleming, J., concurred.