[Crim. No. 20682. Jan. 29, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM ELLIOTT RUCKER, Defendant and Appellant.

COUNSEL

Quin Denvir and Paul Halvonik, State Public Defenders, under appointment by the Court of Appeal, Clifton R. Jeffers, Chief Assistant State Public Defender, B. E. Bergesen III and Linda Feldman, Deputy State Public Defenders, for Defendant and Appellant.

Roger S. Ruffin as Amicus Curiae on behalf of Defendant and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and Dane R. Gillette, Deputy Attorneys General, for Plaintiff and Respondent.

Stanley M. Roden, District Attorney (Santa Barbara), Patrick J. McKinley and Gerald McC. Franklin, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**BIRD, C. J.**—This appeal raises an important issue concerning whether the admission of evidence of two interviews between appellant and law

enforcement officers, which was offered to rebut a defense of diminished capacity, violates the privilege against self-incrimination (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15) and the principles first enunciated in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

I

On July 31, 1976, some time between 7 and 7:30 p.m. a clerk at a See's Candy Store in Redwood City was shot and killed during a robbery. There were no eyewitnesses, but there was strong circumstantial evidence that appellant fired the fatal shot. The only contested issue presented to the jury for decision was appellant's intent at the time of the incident.

The prosecution's theory at trial was that appellant was guilty of first degree murder since the killing either was committed with malice aforethought in a willful, deliberate, premeditated manner or was committed in the course of a robbery. Extensive evidence was introduced by the defense to establish that at the time of the killing, appellant suffered from diminished capacity since his intoxication from alcohol and other drugs made it impossible for him to harbor malice, premeditate, deliberate, or form the specific intent necessary to commit the underlying felony of robbery. This evidence, which the trial judge indicated amounted to an "excellent" defense, included the testimony of lay and expert witnesses as well as the results of a blood test which showed that appellant's blood-alcohol level at the time of the offense was between 0.25 and 0.30 percent.[1]

The prosecution attempted to rebut the defense of diminished capacity by introducing evidence of two interviews with appellant by two police officers and a probation officer. The circumstances surrounding the interviews are somewhat fragmented since the prosecution successfully objected to appellant's repeated requests for an evidentiary hearing on the admissibility of this evidence. The prosecutor claimed that the legality of obtaining the evidence was "not an issue" since the

---

[1]At a blood-alcohol level of 0.10 percent, an automobile driver is presumed to be under the influence of alcohol. (See Veh. Code, § 23126.) At levels between 0.25 and 0.30 percent, about 98 percent of all persons are grossly intoxicated. (Alcohol & The Impaired Driver, A.M.A., Com. on Medicolegal Problems (1970) pp. 10-11.) The mean blood-alcohol level in fatal alcohol overdose cases is approximately 0.40 percent. (*Id.*, at p. 12.)

evidence was "to be used only for the limited purpose for [the jury] to determine the mental processes or the clarity and responsiveness of the Defendant." The trial court agreed and refused to permit an evidentiary hearing.

Two interviews are at issue here. The first involves a tape-recorded interview with appellant conducted by Officer Bob Petitjean and Sergeant Nelson Benton at 9:47 p.m. on the evening of the homicide. An edited version of this tape was played to the jury and a transcript provided. The prosecution labeled the session with the officers as a "booking interview." On five occasions during the interview, appellant either requested to "talk to a lawyer" or to make a phone call. On each occasion, he was either wholly ignored, told to wait "just a minute," told he had to be "booked" first, or informed that "I can't let you do that until I talk to the detective."[2] Although appellant at most indicated a willingness to reveal his name and address, he was required to divulge his virtual life history: his phone number, age, year of birth, city of birth, height, weight, eye color, eye color as recorded on his birth certificate, present employment, occupation ("printer"), type of printer, length of career as printer, how many living parents, where his mother lived, her phone number, his brother's name, who appellant lived with, the name of his high school, its location, the year of his graduation, whether he was in the service, how long he served, where he was stationed, where he did his basic training, what kind of work he did in the military, why he was discharged, where he worked as a machinist, where he started high school, where he lived when he started high school, how long he spent at the high school he graduated from, why he went into the Air Force, when he was discharged, where he was discharged from, when he went to college, where he went to college, what college courses he took, whether he was studying law, and the name of the attorney with whom he was studying.

One portion of the tape of the interview (and the transcript) had been edited to delete reference to certain matters.[3] Those deletions were set forth to the jury in the following manner in the transcript:

---

[2]There is also an indication that appellant had communicated to the police his desire to consult with a lawyer on more than one occasion *prior* to this interview. At the beginning of the interview, having been advised of certain *Miranda* rights and asked if he "wish[ed] to talk of what occurred," appellant stated, "Well, what *I've been telling you when* [sic] *you picked me up, I would talk to a lawyer....*" (Italics added.)

[3]There is no evidence as to what matters were deleted, although the prosecutor represented to the trial court that the deletions involved "inadvertent questions" by the officers about appellant's "prior record."

"BENTON: How was it you only stayed a year in the Air Force?

"RUCKER: Cause I got a general discharge. My first duty assignment was in Thailand and it's the wrong place to send a kid. I got into it, you know.

"BENTON: Do you still use?

"RUCKER: Yep. You want to see?

"BENTON: No, I'm just asking you if you use now.

"RUCKER: Sure, all the time.

"BENTON: When was the last time?

"RUCKER: This morning.

"BENTON: About what time?

"RUCKER: About ten (unreadable). Deleted.

"BENTON: Deleted.

"RUCKER: Deleted.

"BENTON: Deleted.

"RUCKER: Deleted.

"BENTON: Deleted.

"RUCKER: Deleted. So now I'm on this beef. This beef I can beat easy.

"BENTON: Deleted.

"RUCKER: Deleted.

"BENTON: Deleted.

"RUCKER: Deleted. Then I've been printing lately and then I'll get money under the table. Doing alright."

The second interview at issue involves the testimony of appellant's probation officer, Gerald O'Donnell. O'Donnell had been summoned to the jail by a deputy district attorney at about 1:30 a.m. of the morning following the homicide. O'Donnell was asked "simply to talk to [appellant] and form a judgment whether he was acting in a significantly different fashion than [in O'Donnell's] previous experience.... [D]iminished capacity was the phrase used." O'Donnell was told that appellant had been "advised of his rights,"[4] and O'Donnell did not himself attempt to advise appellant of his *Miranda* rights nor seek a waiver of those rights. Instead, he immediately told appellant "this was a very serious case" or "you are charged with a murder case." O'Donnell was allowed to testify that appellant replied he "did not do it" and that he had an alibi for the time in question.

O'Donnell "went on talking" with appellant for about 20 minutes and stated that appellant was responsive to his other "questions." The nature of these questions and responses was not revealed at the trial.[5]

The evidence of the two interviews was admitted into evidence in the prosecution's rebuttal. The court instructed the jury in the following manner:

"Ladies and Gentlemen...You have to be very careful in your mind how you are going to listen to both the tape and the next witness [O'Donnell]. What I am going to give you is a limiting instruction.

---

[4]Presumably the reference to "his rights" pertained to the advisement by Officer Petitjean at the beginning of the first interview. At that time, appellant refused to waive his rights. Apparently, O'Donnell neither inquired nor was advised as to appellant's unwillingness to waive "his rights."

[5]Prior to O'Donnell's testimony, the prosecutor told the judge that O'Donnell "has been cautioned not to allude directly or indirectly to any prior offenses." The prosecutor also stated that O'Donnell and appellant "discussed the charges, but that will not be referred to."

O'Donnell did testify that appellant volunteered he had been drinking, "but I didn't ask him...I didn't want to go in and be interrogating him about this offense." Appellant was precluded by the prosecutor's objection from ascertaining why O'Donnell felt any need to determine whether appellant had been "*Mirandized*" when O'Donnell was not going to "interrogate" him.

As will be seen later, it is the prosecution's position that appellant's statement about an alibi was a spontaneous one.

"The District Attorney is not offering the tape or his subsequent witness who will be evidently testifying about some statements made to him by the Defendant. It is not being offered for you to consider the truth of those statements. It is very important. You are not to listen to the statements to decide whether they were true or not, whether good statements or bad statements or however you want to look at them. That is not why they are being offered to you. You must not think about that aspect of it.

"They are being offered, according to the District Attorney's representations to the Court, to show the mental processes used by the Defendant at the particular time.

"The District Attorney's argument being that he is using that to attack the defense of diminished capacity which has been raised by the Defendant. So it is a fairly fine line, but I know you are an intelligent jury. I am sure you will be able to accept this.

"He is using it not for the truth of the statements in the tape, but for the thought process, the clarity of voice, the intonation, whatever you can get from it and that will also apply to the second, the next witness, the same thing applies there.

"It is not important what was said but whether or not there was a thought process that will assist you in your deliberations. Very important. So remember that.

"On the tape itself—we listened to this yesterday—it is a very very poor tape, very hard to understand and that is why I have suggested a transcript be prepared so that you can read along as you are listening. That is what I was doing yesterday and with that you can pick it up what is being said, how it is being said. There are deletions on the tape. Certain things were not relevant to the matters before you. So I have ordered those particular sections deleted from the tape. You will see on your transcript where it will say 'deleted' and the tape will say 'deleted.' So there are certain portions that were not relevant and we did take out. You are not to worry about or consider those."

The jury returned verdicts finding appellant guilty of first degree murder and first degree robbery, and the allegation was found to be

true that appellant used a firearm in the commission of these offenses. (Pen. Code, §§ 187, 189; former Pen. Code, § 211a; Pen. Code, §§ 1203.06, subd. (a)(1), and 12022.5.) This appeal followed.

## II

The primary issue to be decided by this court is whether the trial court erred in permitting the prosecution to introduce on rebuttal the evidence of the two interviews. Appellant contends the evidence was inadmissible because it was obtained in violation of the safeguards first set forth in *Miranda* v. *Arizona, supra,* 384 U.S. 436, and subsequently made "an intrinsic part of the law of this state." (See *People* v. *Pettingill* (1978) 21 Cal.3d 231, 237 [145 Cal.Rptr. 861, 578 P.2d 108].) The Attorney General admits that the requirements of *Miranda* were not met. However, he urges that compliance was unnecessary for two reasons: (1) the state's questioning of appellant did not call for "testimonial" responses within the meaning of the privilege against self-incrimination and (2) the interrogation was not incriminatory because it fell within the "booking" or "neutral information" exception to *Miranda.*

To resolve this issue, it is necessary to examine the relationship of the *Miranda* doctrine to the privilege against self-incrimination. ■ The privilege is an express mandate of both the California and United States Constitutions.[6] It protects an individual from being compelled to provide "testimonial" evidence which may tend to incriminate him. As a corollary, the privilege precludes the government from using such evidence or its fruits in a criminal proceeding. (See *Murphy* v. *Waterfront Comm'n.* (1964) 378 U.S. 52, 57, fn. 6 [12 L.Ed.2d 678, 683, 84 S.Ct. 1594].) The privilege may be invoked in any setting,[7] and traditionally,

---

[6]The privilege against self-incrimination of the California Constitution is found in article I, section 15, which reads in pertinent part: "Persons may not...be compelled in a criminal cause to be a witness against themselves...." The analogous provision of the federal Constitution is found in the Fifth Amendment, which reads in pertinent part: "No person...shall be compelled in any criminal case to be a witness against himself...."

[7]See *In re Gault* (1967) 387 U.S. 1, 47, 49 [18 L.Ed.2d 527, 557-558, 87 S.Ct. 1428], *Lefkowitz* v. *Turley* (1973) 414 U.S. 70, 77 [38 L.Ed.2d 274, 281-282, 94 S.Ct. 314], *Ex parte Cohen* (1894) 104 Cal. 524, 527-528 [38 P. 364], and *Cramer* v. *Tyars* (1979) 23 Cal.3d 131, 138 [151 Cal.Rptr. 653, 588 P.2d 793].

judicial review of an asserted invasion of the privilege has focused on whether the claimant was (1) actually *compelled* to disclose (2) *testimonial* communications (3) which tended to incriminate him.[8]

The safeguards enunciated in the *Miranda* decision and its "California progeny"[9] are required by the privilege but have been tailored to the specific setting of a "custodial interrogation." The primary focus of the *Miranda* line of decisions is "the compulsion inherent in custodial surroundings." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 458 [16 L.Ed.2d at p. 714].) In order to combat these "inherently compelling pressures" and thus to "permit a full opportunity to exercise the privilege against self-incrimination," the *Miranda* decision held that "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." (*Id.,* at p. 467 [18 L.Ed.2d at p. 719].)

Thus, the *Miranda* analysis is a refinement primarily of the *compulsion* aspect of the privilege. Where actual compulsion must be established under a traditional privilege analysis, *Miranda* holds that compulsion is assumed to exist in a custodial setting unless specified procedural safeguards are carefully followed.[10] However, the fact that the *Miranda* analysis is primarily concerned with the compulsion aspect of the privilege does not alter the fact that the *testimonial* component of the privilege must also be satisfied. Therefore, this court must determine whether appellant's responses at the two interviews were testimonial within the meaning of the privilege.

---

[8]In other contexts, a somewhat different analysis may be appropriate. (See, e.g., *Reynolds* v. *Superior Court* (1974) 12 Cal.3d 834, at p. 839 [117 Cal.Rptr. 437, 528 P.2d 45] [discovery by the prosecution against a criminal defendant]; and *Marchetti* v. *United States* (1968) 390 U.S. 39, 55-57 [19 L.Ed.2d 889, 901-903, 88 S.Ct. 697], and *Grosso* v. *United States* (1968) 390 U.S. 62, 67-69 [19 L.Ed.2d 906, 911-913, 88 S.Ct. 709] [the required records doctrine].)

[9]*People* v. *Disbrow* (1976) 16 Cal.3d 101, at page 113 [127 Cal.Rptr. 360, 545 P.2d 272]; see also *People* v. *Pettingill, supra,* 21 Cal.3d at page 237.

[10]Those safeguards are now quite familiar. A suspect is entitled to be (1) advised of certain constitutional rights prior to any custodial interrogation (*id.,* at pp. 467-474 [16 L.Ed.2d at pp. 719-723]), (2) questioned only if he voluntarily, knowingly and intelligently waives these rights (*id.,* at pp. 475-476 [18 L.Ed.2d at pp. 724-725]), and (3) allowed to "cut off questioning" at any time by indicating he wants an attorney or wishes to remain silent (*id.,* at p. 474 [18 L.Ed.2d at p. 723]).

In the present case, the warnings given appellant were undoubtedly defective. Instead

Not every attempt to obtain incriminating evidence from an accused violates the privilege against self-incrimination. For example, this court and the United States Supreme Court have upheld actions by the state requiring a criminal suspect to give a sample of his blood or breath following an arrest for drunk driving (*People* v. *Duroncelay* (1957) 48 Cal.2d 766 [312 P.2d 690]; *Schmerber* v. *California* (1966) 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826]), to repeat prescribed words for voice identification purposes (*People* v. *Ellis* (1966) 65 Cal.2d 529 [55 Cal.Rptr. 385, 421 P.2d 393]; *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]), to appear in a corporeal lineup (*ibid.*), to write a handwriting exemplar (*Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]), and to wear an item of clothing (*People* v. *White* (1968) 69 Cal.2d 751 [72 Cal.Rptr. 873, 446 P.2d 993]; *Holt* v. *United States* (1910) 218 U.S. 245 [54 L.Ed. 1021, 31 S.Ct. 2]).

These decisions were premised on the concept that "the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." (*Holt* v. *United States, supra,* 210 U.S. at p. 252 [54 L.Ed. at p. 1030].) As the Supreme Court has noted, "[t]he distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communication' or 'testimony,' but that compulsion which makes a suspect or an accused the source of 'real or physical evidence' does not violate it." (*Schmerber* v. *California, supra,* 384 U.S. at p. 764 [16 L.Ed.2d at p. 916]; see also *People* v. *Ellis, supra,* 65 Cal.2d at p. 533.)

This shorthand formulation of a distinction between testimonial and physical evidence is often uninformative, since in many cases "such a distinction is not readily drawn." (*Schmerber* v. *California, supra,* 384 U.S. at p. 764 [16 L.Ed.2d at p. 916].) This court and the Supreme

---

of advising appellant that "if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires" (*id.*, at p. 479 [18 L.Ed.2d at p. 726]), the officer made the following enigmatic statement: "If you have no funds to hire an attorney, the Public Defender will advise you of one to represent you at all stages of the proceedings."

In addition, appellant did not waive his rights; and his request for a lawyer not only failed to bring about an end to the questioning by the police officers, but failed to prevent a later round of questioning by his probation officer.

Court have pointed to a polygraph examination as an example of a source of arguably physical evidence—its results are based upon a suspect's physical reactions—which nevertheless does "evoke the spirit and history" of the privilege (*ibid.*) and is "essentially testimonial" (*People* v. *Ellis, supra,* 65 Cal.2d at p. 537, fn. 9). Thus, this formulation is often less than helpful in determining whether a particular statement compelled from an individual is to be regarded as "testimonial" or merely "physical."

The case law is instructive on this point. In the benchmark decision of *Schmerber* v. *California, supra,* 384 U.S. 757, no violation of the federal privilege was found in a compelled blood-alcohol test, the results of which were to be used in a prosecution for driving under the influence of alcohol. The court noted that the testimonial component of the privilege "reaches an accused's communications, whatever form they might take, and the compulsion of responses that are also communications...." (384 U.S. at pp. 763-764 [16 L.Ed.2d at p. 916].) However, the procedure to extract the blood did not involve "even a shadow of testimonial compulsion...or enforced communication...." (*Id.,* at p. 765 [16 L.Ed.2d at p. 916].) The court noted that the accused's "participation, except as a donor, was irrelevant to the results of the test, which depend on chemical analysis and on that alone." (*Ibid.*)

Almost six months after *Schmerber*, this court held that an accused had no privilege to refuse to participate in a voice identification procedure. (*People* v. *Ellis, supra,* 65 Cal.2d 529.) "In such a test," the court reasoned, "the speaker is asked, not to communicate *ideas or knowledge of facts*, but to engage in the physiological processes necessary to produce a series of articulated sounds, *the verbal meanings of which are unimportant.*" (*Id.,* at pp. 533-534, italics added.) By contrast, the court observed, a lie detector test would be "essentially testimonial" because it is "designed to probe the conscious knowledge of the accused." (*Id.,* at p. 537, fn. 9.)

The court noted that the privilege also involves the protection of privacy values. The "Fifth Amendment right of privacy protects at least *uncommunicated thoughts* and has been extended to preclude compelled production of private papers and documents. [Citation.] A voice test, however, contemplates no such intrusion into privacy; no disclosure of *thought or privately held information* is requested." (*Id.,* at p. 535, italics added.)

Shortly after this court's decision in *Ellis*, the Supreme Court handed down its decisions in the companion cases of *United States* v. *Wade, supra,* 388 U.S. 218, and *Gilbert* v. *California, supra,* 388 U.S. 263. There, the federal privilege was deemed not to have been violated when a person accused of a criminal offense was required to participate in a lineup (*Wade*), speak designated words (*Wade*), or give a handwriting exemplar (*Gilbert*). In reaching these conclusions, the court relied on the fact that the accused had not been required to "disclose *any knowledge* that he might have*" (388 U.S. at p. 222 [18 L.Ed.2d at p. 1155], italics added) or to otherwise communicate information. The words Wade spoke and Gilbert wrote had been prescribed for them by the police. The content of their utterances was not of their own creation. Rather, their responses revealed only "an identifying physical characteristic." (388 U.S. at pp. 222-223 [18 L.Ed.2d at p. 1155]; 388 U.S. at p. 267 [18 L.Ed.2d at p. 1183].)

■ The rationale behind these decisions compels the conclusion that the responses extracted from appellant were testimonial within the meaning of the privilege. Clearly, the responses made by appellant were "communications" on their face for he was asked to "communicate ideas or knowledge of facts." The words appellant spoke were not prescribed for him, as in *Wade*. Rather, he was required to "disclose knowledge" and to reveal "privately held information." Moreover, the "verbal meanings" of his utterances were not "unimportant," as in *Ellis*, but were in fact essential to the purpose for which they were elicited. As far as the prosecution was concerned, the probative value of appellant's disclosures depended on their being responsive to the questions asked him. This responsiveness, in turn, could only be determined by examining the contents of the disclosures themselves and comparing them with the questions asked. Although appellant's disclosures were not being used to *prove* the truth of what was said, their literal contents were necessarily being *relied on* to establish the probative value of the disclosures.

Further, the *accuracy* of the contents of the disclosures was relevant to the purpose for which they were admitted. If the disclosures were shown to be incorrect, even though appearing responsive on their face, then the value of their admission to prove appellant was functioning normally would be diminished.[11]

---

[11]An example may be helpful to an understanding of how the probative value of the interview evidence depended upon both the responsiveness *and* accuracy of appellant's

A related approach to the question as to whether the evidence of the first interview was testimonial focuses on the privacy aspect of the privilege. As this court noted in *People v. Ellis, supra,* 65 Cal.2d at page 535, the privilege's right of privacy protects "at least uncommunicated thoughts" and "privately held information." Requiring responses to questions concerning an appellant's life history thwarted this purpose of the privilege, regardless of the purpose behind the compulsion. To suggest that an individual may be compelled to reveal his thoughts and past history whenever the state wishes to determine his mental capacity in a criminal case is to virtually wipe out the privilege and the protection of privacy which it affords.

The argument is advanced that the evidence of the first interview was not testimonial since the state was only trying to prove appellant's "physical and mental condition." To buttress this contention, cases are cited which hold that a compelled disclosure of "an identifying physical characteristic" such as one's voice, handwriting, body, etc., is a form of physical rather than testimonial or communicative evidence. Therefore, it is argued that the admissions are not protected by the privilege. (*People v. Ellis, supra,* 65 Cal.2d 529 [voice, body]; *United States v. Wade, supra,* 388 U.S. 218 [voice, body]; *People v. Harper* (1953) 115 Cal. App.2d 776 [252 P.2d 950] [handwriting]; *Gilbert v. California, supra,* 388 U.S. 263 [handwriting]; *People v. Goldenson* (1888) 76 Cal. 328 [19 P. 161] [body].)

This argument reveals a fundamental misconception of the privilege against self-incrimination. It assumes the application of the privilege is determined by the nature of the ultimate fact sought to be proved. In fact, it is not *what* the state is attempting to prove which may be protected by the privilege, but *how* the state tries to prove it. For example, even though one of the central issues in a prosecution for driving under the influence of alcohol is the sobriety of the accused, the privilege would forbid the state from compelling an accused to disclose verbally how much he had had to drink or how he felt. The privilege may autho-

---

answers. If an individual were asked where he was born (New York) and he answered in any one of the following ways: (1) "New York;" (2) "Paris;" (3) "I am still waiting to be born;" (4) "I enjoy hot weather, too;" (5) "hums a nursery rhyme," that answer might be probative of his mental state. In a trial in which his defense centered on his inability to formulate the requisite mental state due to his diminished capacity, the trier of fact would draw quite different conclusions depending upon which of the above responses he gave and its accuracy. Clearly, the *content* of the statement determines its probative value.

rize the state to compel him to furnish a blood sample from which his guilt may later be established. This is permitted because the sample is a physical form of evidence and not because it is used to prove an arguably physical fact. (See also *Curcio* v. *United States* (1957) 354 U.S. 118 [1 L.Ed.2d 1225, 77 S.Ct. 1145] [while the custodian of the records of a labor union may be compelled to produce the union's books, he may not be compelled to testify as to their whereabouts if he refuses to produce them].)

It is argued that appellant's responses were nontestimonial since they were not admitted to prove the truth of their literal contents. However, this suggested analogy to the hearsay rule[12] lacks an anchor in law or reason. The privilege against self-incrimination is not a hearsay rule. To have communicative or testimonial value, a compelled disclosure need not be obtained or admitted into evidence to prove its substantive truth. A use of a disclosure for other than the truth of the matter asserted can still be a communicative use.[13]

Nevertheless, the Attorney General urges that appellant's responses were not testimonial because their *contents* were irrelevant. What was essential was not the *contents* of appellant's disclosures, but the *fact* that he was able to articulate appropriate responses. However, this overlooks the fact that the contents of appellant's disclosures were necessarily relevant to the purpose for which they were admitted. Only by examining whether his disclosures were responsive and accurate could anything be inferred about a lack of diminished capacity. (Cf., *ante*, at pp. 382-383.)

If this court were to agree with the arguments of the Attorney General, the state would have the right to *compel* an individual to engage in an incriminating discussion—to use his mental faculties to create evi-

---

[12]The hearsay rule provides that, with certain exceptions not relevant here, an extrajudicial statement is not admissible in court proceedings "to prove the truth of the matter stated." (Evid. Code, § 1200.) However, if otherwise relevant to the proceeding, such a statement may be admitted if offered to prove some issue or fact other than the truth of the matter stated.

[13]Prior cases have not hesitated to apply the privilege to evidence which was admitted for such nonhearsay purposes as impeachment (*New Jersey* v. *Portash* (1979) 440 U.S. 450 [59 L.Ed.2d 501, 99 S.Ct. 1292]) and consciousness of guilt (*People* v. *Simmons* (1946) 28 Cal.2d 699 [172 P.2d.18]; *People* v. *Snyder* (1958) 50 Cal.2d 190 [324 P.2d 1]).

dence against himself—whenever it wished to prove his medical or physical condition. Viewed in this light, the Attorney General's arguments run counter to both the history and the spirit of the privilege, which has been aptly described as "one of our Nation's most cherished principles. . . ." (*Miranda* v. *Arizona, supra,* 384 U.S. at pp. 457-458 [16 L.Ed.2d at p. 714].)

Recently, in *Cramer* v. *Tyars* (1979) 23 Cal.3d 131 [151 Cal.Rptr. 653, 588 P.2d 793], this court stated that the privilege against self-incrimination was not violated by the compelled disclosure of statements revealing an individual's "mental condition" at a civil commitment proceeding of a mentally retarded person.

However, in that decision, the court was careful to note that those proceedings were "essentially civil in nature" and "not analogous to criminal proceedings." (*Id.,* at p. 137.) Moreover, the disclosures permitted in *Tyars* were not incriminatory, since they exposed the individual to civil not criminal liability. Thus, the *Tyars'* language is not informative on the issue of the availability of the privilege in criminal proceedings.[14]

---

[14]Reliance by the concurring and dissenting opinion on *Cramer* v. *Tyars* is totally misplaced in the present criminal case. It should be remembered that in *Tyars,* this court considered basically *two* sets of statements compelled from the conservatee. The first set involved compelled utterances by Mr. Tyars which revealed potential "evidence of criminal conduct." (*Id.,* at p. 138.) The second set involved compelled statements by Tyars which did not relate to "any *criminal* conduct" (*ibid.*) but which were relevant only to his nonincriminating, civil liability as a potential conservatee.

Both sets of statements had been admitted at Tyars' conservatorship hearing for a single purpose—*not* to prove the truth of their contents, but rather "to reveal to the trier of fact his [i.e., Tyars'] physical or mental characteristics." (*Id.,* at p. 137.) If the concurring and dissenting opinion were correct that compelled disclosures are nontestimonial whenever the purpose of their admission is not to prove the truth or falsity of the words spoken but rather the manner, then *both* sets of statements in Tyars would have been nontestimonial and hence outside the protection of the privilege against self-incrimination.

However, that is not what this court held. Rather, the court stated that the first set of statements *was* protected by the privilege (and, therefore, testimonial) and the second set was not. Obviously, the nonhearsay purpose for which both sets of statements were admitted could not have been the basis for this court's determination whether the privilege applied. One set of statements in *Tyars* was held to be protected even though not admitted for the truth or falsity of its contents but to show the manner in which Tyars responded to questions. The other set was held not to be protected despite its being admitted for the identical purpose as the first.

The true difference between the statements—the difference on which the court's decision turned—was that one set of statements was incriminating (i.e., those which tended to implicate Tyars in *criminal* activity) and one set was not (i.e., those which subjected Tyars only to potential *civil* liability). (For a discussion of the potential for incrimination of the interview evidence in the present case, see *post,* at pp. 387-389.)

This court holds that the evidence elicited during the two interviews was testimonial within the meaning of the state and federal privileges against self-incrimination.

## III

Next, it is urged that compliance with the requirements of *Miranda* was unnecessary in this case because neither interview amounted to an "interrogation" within the meaning of that decision. ■ The Supreme Court defined custodial interrogation in Miranda as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (384 U.S. at p. 444 [16 L.Ed.2d at p. 706].) Recently, this court reaffirmed that an interrogation is "'a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support [a person's] arrest and ultimately his guilt.'" (*People* v. *Pettingill, supra*, 21 Cal.3d at p. 244.)

In the present case, the questioning of appellant by the police and by the probation officer was clearly "initiated by law enforcement officers." (*Miranda* v. *Arizona, supra*, 384 U.S. at p. 444 [16 L.Ed.2d at p. 706].) The interviews were hardly "the result of the defendant's own initiative." (*People* v. *Ireland* (1969) 70 Cal.2d 522, 536 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].) If these interviews were not "interrogations," the prosecution would bear the burden of establishing that fact. (See *People* v. *White, supra*, 69 Cal.2d at p. 761.)

■ There can be no question that the interview by the probation officer constituted an interrogation. It elicited a highly incriminatory response from appellant, a false claim that he had an alibi.[15] Moreover, the express purpose of this confrontation was to obtain evidence of appellant's mental capacity with respect to the offenses he had committed. That the purpose of the interview might not have been to elicit statements concerning the physical acts involved in the crimes is irrelevant. The intent with which an act is done is just as much an element of these offenses as are appellant's acts themselves. (Pen. Code, § 20.) Questions designed to elicit information about intent, albeit indirectly, are no less incriminatory than are similar indirect questions about a person's

---

[15]It is argued that this statement by appellant was a spontaneous one but the facts indicate the contrary to be true.

Prior to his interview with the probation officer, appellant had refused to waive his rights and on several occasions sought to contact an attorney. Several hours later, ap-

actions or knowledge or motive. The Court of Appeal has held that the fact that an interview is to be used "as a basis for determining the mental condition of the accused does not remove it from a process of interrogation that lends itself to eliciting incriminating statements, nor shield it from the dangers against which the rule seeks to guard an accused."[16] (*People v. Montgomery* (1965) 235 Cal.App.2d 582, 590 [45 Cal.Rptr. 475]; *People v. Walker, supra*, 29 Cal.App.3d at p. 454; see also *People v. Bennett* (1976) 58 Cal.App.3d 230 [129 Cal.Rptr. 679].)

Additional considerations come into play in connection with the earlier interview by Officers Petitjean and Benton. Respondent characterizes this session as a "booking" or "neutral information" interview. ■ The *Miranda* safeguards are not necessary at a proper booking interview at which certain basic information is elicited having nothing to do with the circumstances surrounding any offense with which the defendant has been charged. (See, e.g., *People v. Hernandez* (1968) 263 Cal.App.2d 242 [69 Cal.Rptr. 448]; *People v. Van Alstyne* (1975) 46 Cal.App.3d 900 [121 Cal.Rptr. 363].) The booking procedure, as defined by statute (Pen. Code, § 7, subd. 21), has been described as "essentially a clerical process." (Kamisar et al., Modern Criminal Procedure (1974) p. 6.) The limited information needed at a booking procedure is required solely for the purposes of internal jail administration, not for use in connection with any criminal proceeding against the arrestee. When use of this information is confined to those proper purposes, its elicitation cannot be considered incriminatory.

---

pellant was again brought out for an "interview," this time by his probation officer, and was not even advised of his rights. The officer's first words to appellant were intended to and did convey that "this was a very serious case." In response, appellant made the admission in question. This was not a contact initiated by appellant, and his response to the officer's implied accusation could hardly have been unexpected. (See *People v. White, supra*, 69 Cal.2d at pp. 760-761.) Obviously, it was not spontaneous. (See *People v. Randall* (1970) 1 Cal.3d 948, 958 [83 Cal.Rptr. 658, 464 P.2d 114] [once an accused has invoked his *Miranda* rights, a police-initiated interrogation "*cannot* produce voluntary waivers or spontaneous statements."].)

[16]It is not significant that the probation officer for the most part testified to his conclusions or opinions about appellant's responsiveness and not to the actual substance of appellant's responses. Not only is such opinion testimony inadmissible as a fruit of the illegal interrogation, it is also objectionable on other grounds: (1) without learning the contents of the underlying conversation, such testimony is conclusory (see *People v. Simmons, supra*, 28 Cal.2d at pp. 717-718; *People v. Walker* (1972) 29 Cal.App.3d 448, 454-455 [105 Cal.Rptr. 672]), and (2) the jury is likely to conclude from the obvious gap in the testimony that "incriminating matters were being withheld from them" (*id.*, at p. 455).

However, in the present case, the prosecution used appellant's responses to the officers' "booking" questions to prove his guilt at trial. This use brought to the jury's attention a great deal of patently incriminatory and prejudicial material, including (1) the appellant invoking his rights on five separate occasions (cf., *Miranda* v. *Arizona, supra,* 384 U.S. at p. 468, fn. 37 [16 L.Ed.2d at p. 720]; *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]); (2) the statement to the officers that "so now I'm on this beef. This beef I can beat easy."; (3) an admission appellant was "get[ting] money under the table" in connection with a job as a printer; and (4) an admission he drove without a driver's license. Also, the transcript given to the jury contained 10 deletions, which could only have told the jury that more incriminatory material had been omitted. (Cf., *People* v. *Walker* (1972) 29 Cal.App.3d 448, 454-455 [105 Cal.Rptr. 672].) Finally, the entire interview was tape recorded and covered far-ranging aspects of appellant's life, including whether he studied law, why he went into the military service, and where he lived at the time he started high school. These questions far exceeded any legitimate need for information by the jail authorities.

Even the remaining information, if introduced at a criminal proceeding, would tend to incriminate. Wigmore has noted that "[t]he privilege applies to *any* fact which is relevant to a proceeding whose sole or essential object is to charge the claimant with a specific crime." (8 Wigmore, Evidence (McNaughton rev. ed. 1961) § 2260, p. 369, original italics, fns. omitted.) Here, the only issues in question at trial were appellant's intent and mental capacity at the time of the commission of the offenses. The questioning of appellant during the first interview was used to establish these elements of the charges against him, and "at least on the prosecution's assumption" (*ibid.*), appellant's responses were incriminating.

The fact that most of appellant's disclosures related to biographical material and statistical data, rather than the facts of the crime per se, is not dispositive. (See *People* v. *McCormick* (1951) 102 Cal.App.2d Supp. 954 [228 P.2d 349] [striking down under the California privilege a local ordinance requiring every "member of any communist organization" to register his name, inter alia, with the local sheriff]; *Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320 [85 Cal.Rptr. 129, 466 P.2d 673], *Bradshaw* v. *Superior Court* (1970) 2 Cal.3d 332 [85 Cal.Rptr. 136, 466 P.2d 680], and *Allen* v. *Superior Court* (1976) 18

Cal.3d 520 [134 Cal.Rptr. 774, 557 P.2d 65] [in each of these decisions, the court struck down under the California privilege an order compelling a criminal defendant to reveal, inter alia, the names and addresses of prospective witnesses]; *Marchetti* v. *United States* (1968) 390 U.S. 39 [19 L.Ed.2d 889, 88 S.Ct. 697] and *Grosso* v. *United States* (1968) 390 U.S. 62 [19 L.Ed.2d 906, 88 S.Ct. 709] [striking down under the federal privilege a statute which required a gambler to register, inter alia, his name, residence and business address with the local Internal Revenue Service]; compare, *California* v. *Byers* (1971) 402 U.S. 424 [29 L.Ed.2d 9, 91 S.Ct. 1535].)

It is not just the nature of the information revealed but the potential for incrimination under all the circumstances that is important. In the present case, appellant had been arrested for a homicide. Homicide is "'an area permeated with criminal statutes,'" and those arrested for murder are, for purposes of the privilege, "a group 'inherently suspect of criminal activities.'" (See *Marchetti* v. *United States, supra*, 390 U.S. at p. 47 [19 L.Ed.2d at p. 897].) As the present case illustrates, the hazards of incrimination from an unreasonable booking interview are not "trifling or imaginary."[17] (*Id.*, at p. 54 [18 L.Ed.2d at p. 901].) Evidence of an arrestee's responses to booking questions can constitute "evidence which will facilitate [his] conviction[]" unless its use is limited to the purposes for which it was elicited. (*Ibid.*)

Jail officials still retain the right to satisfy a demonstrated need for certain basic information concerning the arrestees in their custody. This need can be accommodated by permitting the state to obtain from an arrestee the basic, neutral information that is necessary for proper jail administration, but forbidding the state from using the arrestee's responses in any manner in a subsequent criminal proceeding. Therefore, *Miranda* warnings need not be given at a booking interrogation, since the information acquired cannot be put to any incriminatory uses. For this reason, evidence of the "booking" interview with appellant was not admissible on the substantive criminal charges.

### IV

Next, it is contended that even if the evidence of the two interviews were inadmissible in the prosecution's case-in-chief, it was

---

[17]See also, *People* v. *Walters* (1967) 252 Cal.App.2d 336 [60 Cal.Rptr. 374]; *People* v. *Hernandez, supra*, 263 Cal.App.2d 242; *People* v. *Van Alstyne, supra*, 46 Cal.App.3d 900.

nevertheless properly admitted on rebuttal following appellant's presentation of a diminished capacity defense.

The case law is clear. The privilege against self-incrimination forbids "the use of... [an individual's] compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." (*Lefkowitz* v. *Turley, supra*, 414 U.S. at p. 78 [38 L.Ed.2d at p. 282].) It provides "a sweeping proscription of *any use, direct or indirect*, of the compelled testimony and any information derived therefrom."[18] (*Kastigar* v. *United States* (1972) 406 U.S. 441, 460 [32 L.Ed.2d 212, 226, 92 S.Ct. 1653], italics added; see also *People* v. *McCormick, supra*, 102 Cal.App.2d Supp. at pp. 957-958.) Significantly, the United States Supreme Court has recently held that the federal Constitution forbids the state from using an individual's statements, taken in violation of the Fifth Amendment privilege, to impeach his testimony at a criminal trial at which he is a defendant. (*New Jersey* v. *Portash, supra*, 440 U.S. 450.) Since the protection accorded to individuals in this state by the privilege against self-incrimination in the California Constitution is at least as broad as, and often broader than, that accorded by the federal Constitution, the *Portash* conclusion would also apply to our state Constitution. (See *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272].)

Moreover, under the California Constitution, if there has been a failure to comply with *Miranda*'s safeguards, "*any* [resulting] extrajudicial statement by the defendant, whether inculpatory or exculpatory," is inadmissible "either as affirmative evidence or for purposes of impeachment." (*Id.*, at p. 113, italics added.)

The contention is made that these rules do not apply here because "[w]hat the prosecutor sought to [prove] in this case was not the substance of any remarks or comments appellant might have made, but rather his ability to respond as evidenced by his attitude [and] logic of reply...." Such an evidentiary purpose, it is asserted, is merely "neutral" rather than "inculpatory or exculpatory."

---

[18]Since the privilege prohibits the use or derivative use of evidence obtained in violation thereof, it would forbid the officers from testifying *in any manner* concerning their conversation with appellant, including possible testimony limited to their overall impression that appellant appeared to be responsive to questions.

However, it is irrelevant that the responses of appellant were not admitted to prove the truth of their literal contents. The courts of this state have consistently excluded evidence which had been admitted for a nonhearsay purpose. (See, e.g., *People v. White, supra,* 69 Cal.2d at pp. 761-762 [illegally obtained statements excluded which were offered to show an accused's "callousness and lack of remorse"]; *People v. Disbrow, supra,* 16 Cal.3d 101 [illegally obtained statements excluded which were offered to impeach credibility of testifying defendant]; *People v. Bennett, supra,* 58 Cal.App.3d 230 [illegally obtained statements excluded which were offered to show defendant's motive].)

The salient point is that in this state, the exclusionary rules relating to *Miranda* and to the privilege apply regardless of the purpose for which the response is sought to be admitted or the timing of its admission. (See *People v. Disbrow, supra,* 16 Cal.3d 101 [impeachment evidence on rebuttal]; *People v. Walker, supra,* 29 Cal.App.3d 448 [testimony of a psychiatrist, based on illegal interrogation, inadmissible on rebuttal to attack diminished capacity defense].)

V

The next question to be resolved is whether the erroneous admission of the interview evidence was prejudicial. An examination of the record of these statements indicates that the error was prejudicial within the meaning of *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].

At trial, appellant presented what the judge characterized as an "excellent" defense of diminished capacity. Evidence of appellant's statements went directly to that defense. The question of the degree of appellant's criminal liability was not clear-cut since the sole issue presented to the jury was the defense of diminished capacity. The fact that the jury deliberated nine hours before reaching a verdict underscores this fact. Further, the statements which intimated that appellant was fabricating his defense were most prejudicial. Taking into consideration all these factors, this court finds the introduction of these statements amounted to the prejudicial error. Therefore, the judgment of conviction is reversed.

Tobriner, J., Mosk, J., and Newman, J., concurred.

**RICHARDSON, J.,** Concurring and Dissenting.—I concur in the determination that the defendant's conviction must be reversed. In addition

and by way of clarification, however, I wish to reaffirm strongly that the status of legitimate booking interviews remains unaltered following today's opinion.

    I.   *Advice as to Constitutional Rights Is Not Required for Routine Police Questioning Regarding Personal Identification and Background Information During the Booking Process*

It is clear that the traditional booking interview, limited to routine questions asked for the purpose of completing personal data on a police form, is unaffected by our holding here. The regular and routine processing of individuals who have been arrested for suspected criminal conduct necessitates that the police obtain information to confirm the identity of the suspect, to provide for medical care if such is required, to identify next of kin in the event of an emergency, and to accomplish various other valid police functions directly related to booking.

In order to eliminate the compulsion inherent in custodial police interrogation, a criminal suspect must be warned that he has a right to remain silent, that anything he says can be used against him; that he has the right to the presence of an attorney and if he cannot afford one, an attorney will be appointed by the court. (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 479 [16 L.Ed.2d 694, 726, 86 S.Ct. 1602, 10 A.L.R.3d 974].) These warnings are absolute prerequisites to interrogation designed to elicit incriminating statements. (*Id.*, at p. 471 [16 L.Ed.2d at p. 722]; see *People* v. *Stewart* (1965) 62 Cal.2d 571, 579 [43 Cal.Rptr. 201, 400 P.2d 97].)

Conversely, it is equally well established that the *Miranda* rules do not apply to routine booking questions relating to personal identification and background information, which questions have nothing to do with the circumstances surrounding the offense with which the declarant is charged. In such situations, there is "no process of interrogation 'designed to elicit incriminating statements.'" (*People* v. *Hernandez* (1968) 263 Cal.App.2d 242, 253 [69 Cal.Rptr. 448], quoting *People* v. *Walters* (1967) 252 Cal.App.2d 336, 338 [60 Cal.Rptr. 374]; *People* v. *Palmer* (1978) 80 Cal.App.3d 239, 256 [145 Cal.Rptr. 466].) Indeed, such routine information can be elicited from a suspect in custody even after he has exercised one or more of his *Miranda* rights. (*People* v. *Van Alstyne* (1975) 46 Cal.App.3d 900, 908 [121 Cal.Rptr. 363]; *People* v. *Johnson* (1971) 20 Cal.App.3d 168, 175 [97 Cal.Rptr. 332].)

When the police have concluded asking those questions directly related to the completion of the requisite forms and to other formalities attendant on booking the suspect, the "booking interview" is concluded. If the police wish to continue questioning the suspect once the limited purposes of booking have been fulfilled, they must apprise the individual of those constitutional rights enumerated above and obtain a waiver of those rights. The interrogation, regardless of the nature of the questions, may not otherwise continue once the requirements of booking are satisfied. If the interview does continue without the requisite warnings and waiver, the questions and responses to them may be subject to a subsequent suppression motion.

I do not suggest an approved litany of questions for use during the booking interview. The precise questions will undoubtedly vary in number and form from police department to police department. If a defendant wishes to challenge questions which he believes are extraneous to the booking function and, therefore, improperly asked, and which he was obliged to answer, resolution of the matter will be left to the sound discretion of the trial court.

## II. *Improper Questioning Necessitates Reversal in Present Case*

Applying the foregoing legal principles to the present case, it seems to me self-evident that the police were entitled to ask defendant booking questions. They were not obliged to preface those questions with any *Miranda* warning nor were they, before the conclusion of the booking interview, obliged to honor defendant's request for an attorney.

However, it seems equally evident that the numerous questions asked regarding defendant's military service and his past and present educational experience exceeded the scope of any valid booking interview. These questions were, therefore, improper in the absence of an admonition regarding defendant's constitutional rights and his waiver of those rights.

Distilled from those questions impermissibly asked and included in the material presented to the jury were defendant's repeated request for an attorney, arguably an improper comment on his exercise of his constitutional rights (*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]), admissions that he engaged in various forms of petty illegal conduct, and, perhaps most damaging, a tran-

script containing 10 deletions, which may have suggested to the jury the presence of additional inculpatory evidence not presented to the jury.

Because it is not clear that the admission of this evidence, obtained in violation of defendant's constitutional rights, was harmless beyond a reasonable doubt (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]), in my view, the conviction must be reversed.

### III. *Evidence of Proper Booking Questions Is Admissible to Prove Appellant's Mental Condition*

Turning to the evidence secured during the booking interview proper, I now consider whether it was validly admitted in this case. I must respectfully dissent from those portions of the majority opinion (*ante*, p. 389) which hold that, although the police may obtain neutral information necessary for proper jail administration, the state may not thereafter use the arrestee's responses to legitimate booking questions in any manner in a subsequent criminal proceeding. The initial receipt of this information was clearly authorized. It trenched on no constitutional rights and the subsequent use of evidence of the booking interview should be analogized to the disclosure of physical as opposed to testimonial evidence.

Recently we addressed this distinction in *Cramer* v. *Tyars* (1979) 23 Cal.3d 131 [151 Cal.Rptr. 653, 588 P.2d 793]. We there said (at p. 139): "We conclude that, while appellant could not be questioned about matters that would tend to incriminate him, he was subject to call as a witness and could be required to respond to nonincriminatory questioning which may have revealed his mental condition to the jury, whose duty it was to determine whether he was mentally retarded. Reason and common sense suggest that it is appropriate under such circumstances that a jury be permitted fully to observe the person sought to be committed, and to hear him speak and respond in order that it may make an informed judgment as to the level of his mental and intellectual functioning. The receipt of such evidence may be analogized to the disclosure of physical as opposed to testimonial evidence and may in fact be the most reliable proof and probative indicator of the person's present mental condition. (See *People* v. *Ellis* (1966) 65 Cal.2d 529, 533-534...[voice identification not within the privilege against self-incrimination]; *People* v. *Arnold* (1966) 243 Cal.App.2d

...[handwriting identification not within the privilege against self-incrimination].) Similarly, a defendant even in a criminal proceeding may be required to give 'real or physical' evidence in contrast to 'communications or testimony' in the sense of disclosing knowledge. Thus the criminal defendant may be asked to stand, wear clothing, hold items, or speak words. (*People* v. *Ellis, supra*, at pp. 533-534; *People* v. *Sims* (1976) 64 Cal.App.3d 544, 552....) It was proper for the jury to have the benefit of its own observations of Tyars' responses, both in manner and content, to the court's questions." (See also *People* v. *James* (1977) 19 Cal.3d 99, 114-115 [137 Cal.Rptr. 447, 561 P.2d 1135] [consent to search need not be preceded by *Miranda* warnings].)

Here, the trial court in careful instructions to the jury (see *ante*, pp. 376-377) specifically limited the admission of the interview evidence, the court stating, inter alia, "It is not being offered for you to consider the truth of those statements....He is not using it for the truth of the statements in the tape, but for the thought process, the clarity of voice, the intonation, whatever you can get from it...." Thus, the majority's claim that the accuracy of the contents of the disclosures was relevant (*ante*, p. 382), ignores the explicit instructions of the trial court to the jury and is wholly divorced from the context of this case.

The limited purpose for which evidence of the otherwise proper booking interview was admitted distinguishes this case from those relied upon by the majority to support their conclusion that admission of the evidence violated *Miranda*. It is the nontestimonial character of this evidence rather than its nonhearsay purpose which removes it from the reach of *Miranda*. Without exception the cases cited by the majority wherein the *Miranda* rule was applied to exclude evidence admitted for a nonhearsay purpose all involved testimonial evidence. By making this distinction, I do not mean to suggest that there may not be other valid bases on which evidence secured during a proper booking interview may be admitted. I have attempted here only to determine the validity of the basis on which the evidence was admitted in this case.

IV. *Conclusion*

I conclude that appellant's conviction must be reversed under the well established constitutional principles discussed, *ante*, part II, and that

the majority's extension of these principles on the facts in this case is both unnecessary and unsupportable.

I would reverse the judgment.

Clark, J., and Manuel, J., concurred.

Respondent's petition for a rehearing was denied February 27, 1980. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the petition should be granted.