Filed 8/17/20  P. v. Beal CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL SCOTT BEAL,<br><br>        Defendant and Appellant. | A151336<br><br><br>(Alameda County<br>Super. Ct. No. H58233) |

This is an appeal from judgment after a jury convicted defendant Michael Scott Beal of nine counts of felony grand theft of real property with enhancements for excessive loss and aggravated white collar crime.[1] Defendant was sentenced to five years in prison and ordered to pay the victim, N.J.,[2] $476,000 in restitution.  Defendant challenges the judgment on

---

[1] The trial court subsequently set aside the jury verdicts as to eight of these counts and dismissed them pursuant to *People v. Whitmer* (2014) 59 Cal.4th 733.  In *Whitmer*, the court held that a defendant may be convicted of multiple separate counts of felony grand theft even if committed pursuant to a single overarching scheme.  However, because, under the law that had previously existed for decades, a defendant could only be convicted of one count of grand theft under these circumstances, the court declined to apply this new rule retroactively to the *Whitmer* defendant.  (*Id.* at pp. 740–742.)

[2] Pursuant to California Rules of Court, rule 8.90(b)(4), we refer to the victim by her initials to respect her privacy.

several grounds,[3] including prosecutorial misconduct that undermined his state and federal rights to a fair trial and evidentiary errors.

We conclude the prosecutor repeatedly used deceptive or reprehensible methods that, given their cumulative impact, denied defendant his right to a fair trial. We therefore reverse the judgment and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 21, 2015, defendant was charged by information with nine counts of felony grand theft of property committed against N.J. between January 1, 2007, and December 31, 2015 (first–ninth counts; Pen. Code, § 487, subd. (a)),[4] and one count of forgery committed on June 2, 2011 (tenth count; § 470, subd. (d)). As to the first, fifth, and sixth counts, it was alleged defendant took property valued in excess of $200,000, $65,000 and $65,000, respectively (former § 12022.6, subd. (a)). As to the first through the ninth counts, it was alleged the underlying crimes constituted a pattern of related felony conduct involving the taking of someone's personal property by fraud or embezzlement causing the person a loss in excess of $100,000 (§ 186.11, subd. (a)(1)). The tenth count was subsequently dismissed pursuant to section 1118.1. Trial began on December 5, 2016.

---

[3] Defendant raises four issues on appeal: (1) Did the prosecution engage in an egregious pattern of misconduct or deceptive or reprehensible methods to convince jurors of his guilt that prevented him from receiving a fair trial? (2) Did the trial court prejudicially err by failing to grant his motions for mistrial or abuse its discretion when failing to grant his motion for dismissal, each of which was based on the prosecutor's misconduct? (3) Did the trial court prejudicially err when admitting into evidence recordings N.J. made of her phone conversations with defendant or testimony from five female witnesses regarding their romantic relationships with defendant? (4) Does cumulative error warrant reversal?

[4] Unless otherwise stated, all statutory citations herein are to the Penal Code.

2

## A.  Introduction.

The facts of this case are cloudy and convoluted.  The two primary witnesses—defendant and his alleged victim, N.J.—presented vastly differing accounts of the nature of their relationship, both personal and business, at trial.  When speaking to each other, they used a code language.  They both took pains to keep aspects of their dealings secret.  They admittedly lied to each other and others.

That said, the fundamental issue in this case is the conduct not of defendant or N.J. but of the prosecutor during trial.  Simply put, the prosecutor repeatedly crossed the lines of permissible professional conduct in the jury's presence, undercutting defendant's right to a fair trial.  However, because prosecutorial misconduct is grounds for reversal for a new trial only if prejudicial (*People v. Brown* (2003) 31 Cal.4th 518, 553–554), we must tell the whole story, start to finish.

## B.  Defendant and N.J.: Their Backgrounds and Relationship.

N.J., in her early 50's at the time of trial, began working independently as a sex worker in her 20's.[5]  She also earned money through her three years of military service (1983–1986), recycling work, participation in focus groups and other research programs, domestic service and panhandling.  N.J. managed to save quite a substantial sum of money with her earnings and some inheritance, part of which she used to buy an ownership interest in her mother's house and, later, to pay off the house's mortgage.  With modest personal expenses,[6] she then placed the rest in an investment account at a

---

[5] N.J. refers to her work as prostitution.

[6] Her regular expenses consisted of a $20 disabled bus pass, $25 phone bill, property taxes and food.

large banking institution actively managed by a broker. Over the years, the account grew substantially.[7]

During this time, defendant was a police officer for the Hayward Police Department, rising to the rank of sergeant in 2008. N.J. met defendant in 2002 while he was working undercover. Posing as a potential client, defendant assisted in N.J.'s arrest for prostitution after she agreed to perform oral sex for $40. N.J. later agreed to work as an informant for the Hayward Police Department "to work [her prostitution] case off . . . ." She worked as an informant supervised by defendant for about a year and a half. According to defendant, the department stopped using N.J. as an informant because of her rule-breaking and deceptiveness.

In 2003, N.J. revealed to defendant that she had a sizable investment portfolio worth "hundreds of thousands of dollars . . . ." Also in 2003, N.J. began occasionally performing oral sex, for free, on defendant. N.J. testified that she performed oral sex on defendant hundreds of times between 2004 and 2012 while he was on and off duty and in various places including his vehicle and apartments. She kept track of how many times "[j]ust [as] a score." Defendant denied having sex with N.J.

Around 2004, N.J. began helping defendant with his online business selling decals, figurines and paints for an electric football game. According to defendant, he hired N.J. for his business, which he started around 2000 or 2001, because she was destitute and needed help staying out of trouble. He

_____

[7] When N.J. first started buying CD's, money market accounts, and other investment products in the 1990's (at Great Western Bank, which was acquired by Washington Mutual Bank), she primarily decided where to invest her money after reading newspaper or magazine articles. Around 2008, after Washington Mutual was acquired by Chase, N.J. began working with a Chase portfolio manager.

eventually agreed to let N.J. sell his products on her own, and she paid him $4,000 for inventory. Defendant kept his business earnings in a PayPal account and helped N.J. set up a PayPal account for her earnings. Defendant had access to N.J.'s account. At first, defendant grossed about $12,000 yearly, but by 2006 he was grossing $22,000, receiving most payments in cash, money order, or through PayPal.

This collaboration stopped in 2006 or 2007, when N.J. returned to sex work. In 2010 or 2011, defendant sold his internet business software for $25,000.

## C. Defendant and N.J.'s Property Investment.

In the mid-2000's, defendant and N.J. began to discuss investing in property together. Defendant told N.J. she likely would not be approved for a loan because she did not use a credit card and lacked a credit history. He convinced N.J. that he would have a better credit score if his own credit cards were paid off. N.J. subsequently gave defendant nearly $10,000 in cash to pay off his credit card debt. N.J. suggested that they purchase property through a " 'C' corporation," which would cost them a fee but allow them to hide their connection to the property. Defendant agreed to this plan.

In 2007, N.J. gave defendant about $4,000 in cash for a down payment or closing costs on some property. According to N.J., defendant subsequently told her that they had purchased a 2,000-square-foot-plus house in Alameda with four bedrooms and a guest cottage worth $2.3 million for around $560,000 or $675,000.[8] Defendant did not reveal the property's precise location, but he showed her some paperwork for their purchase with portions

---

[8] N.J. testified on direct that the house cost $675,000. On cross-examination, she testified that it may have been only $560,000 or $565,000; however, she did not write down the exact amount.

5

redacted. Beginning in July or August 2007, N.J. generally paid between $1,300 and $1,500 each month for the mortgage.

At trial, N.J. acknowledged that she had agreed that only defendant's name would appear on the title. N.J. also understood she would be investing in the property "sight unseen" and would not initially be told of its location. She trusted defendant because he was a police officer. According to N.J., the initial plan was for the property to be rented. Once defendant retired, however, they agreed that N.J. would move in and have her name added to the title and the pair would get married.[9] Rather than a marriage of love, it would be primarily for the tax benefits. N.J. explained that once defendant retired, "I was supposed to own half, yes, get half, yes."

In addition to making monthly mortgage payments, N.J. sometimes gave defendant additional money to cover property expenses, including tax assessments, repairs, and extra mortgage payments. These payments included $5,000 to $7,000 in 2008 to repair the roof; $50,000 in 2010 to pay down their mortgage and reduce their monthly payment; $140,000 in 2011 to pay off her half of the outstanding mortgage; and $110,000 as a loan in 2012 to pay off his half of the mortgage (which he promised to repay). N.J. made her last mortgage payment to defendant in January 2015.

In his testimony, defendant disagreed with N.J.'s description of their property deal in several respects. First, defendant denied telling N.J. the house was in Alameda, explaining that, while she wanted a house in the East Bay, he did not want to live near where he worked. Defendant chose Modesto, although they had not discussed this location, because they were priced out of the Peninsula. Defendant was prequalified for a mortgage on a

_____

[9] Defendant told N.J. it was against department rules for them to marry while he was active on the force.

6

house on Viader Drive in Modesto by a lender named S.N. S.N. did not accept cash, so he recommended defendant obtain a "gift letter." Defendant obtained this letter from his then girlfriend, J.L.[10] After closing on the property, defendant's ex-wife J.B. and their children moved into to N.J. and defendant's new house. He did not tell N.J. the property's address because of her intrusiveness but showed her a copy of one of the mortgage documents with the address redacted. According to defendant, N.J. knew the house was in Modesto because she snooped on his daughter's social media.

Defendant acknowledged the house was purchased with N.J.'s down payment money. Per their agreement, N.J. was obligated to pay the monthly mortgage and taxes through February 2015, after which defendant would assume responsibility for these charges. He repaid N.J. for all or nearly all of his half of the $75,000 down payment over time with no interest.

Defendant also claimed N.J. had agreed that his ex-wife and children would initially live in the house. When market conditions peaked, their plan was to sell it, with defendant having the right to buy out N.J.'s interest. They never agreed to marry or have N.J. live in the house. While N.J. could add her name to the title at some point at her own cost, defendant did not agree to joint survivorship because he wanted the house to go to his children.

Defendant admitted this agreement was "very one-sided towards me" but explained "[N.J.] agreed because she couldn't have purchased the home without me." Defendant testified that, while the pair did not initially put these terms in writing, in the fall of 2011, after the house was purchased,

---

[10] Defendant lied on the loan application that he had no obligation to pay alimony or family support, had not borrowed for the down payment, and that no one else could claim an interest in the property.

7

they drafted and signed a contract mostly written by N.J. No copy of this contract was produced at trial.

## D. The Pair's Other Business Dealings.

N.J. testified that she regularly loaned defendant cash for his personal expenses, including in 2003 for gas and Christmas gifts for his children; about $10,000 in 2006 to pay off credit cards; $10,000 in 2008 to buy a car; several thousand in 2010 for car repairs and Christmas presents for his kids; a "few thousand" in 2013 for medical-related expenses after he was diagnosed with cancer; and $7,000 for dental work and vision correction surgery in 2014. She expected defendant to repay her for these items.

Defendant disputed most of these "loans" but acknowledged they had many business dealings over the years. Several times defendant invested money with N.J. and generally received a return on it. For these investments, defendant would take money from his internet business and deposit it in N.J.'s PayPal account. Between 2008 and 2015, defendant invested about $40,000 with N.J. This allowed her to take a percentage of his return.[11] N.J. sometimes charged him "a broker's fee" when he took money out that he had invested with her to cover a personal expense, such as the $4,500 bill for his daughter's teeth straightening. In addition, she sometimes loaned him money on a short-term basis.

Defendant disputed N.J.'s claims at trial that she once stole electronics from a store at his direction and had her make "[h]undreds" of harassing phone calls to someone called " 'douche bag' " at a phone number with a "408" area code.

_____

[11] N.J. disputed defendant's claim that he invested $40,000 (or any other amount) in her Chase account.

## E. The Ledger.

Defendant testified at trial that N.J. kept a ledger in a notebook in which she recorded all of their transactions. Defendant also testified that he asked N.J. for a copy of it, but she never gave it to him.

N.J.'s testimony at trial was unclear as to whether she recorded these transactions. At one point, N.J. testified that she destroyed all records of her loans to defendant in 2014; she later testified that, while "[h]e never signed anything," she kept some receipts or "scraps" of paper documenting these loans. N.J. claimed some of these scraps could be in her house but most had been thrown out. She never asked defendant for any receipts or to sign any document indicating the amounts she gave him.

At the preliminary hearing, N.J. testified at one point that she kept a ledger of her financial transactions with defendant. Later at the same hearing, however, N.J. testified that she did not know what a ledger was.

At trial, no records of N.J.'s payments to defendant were produced. N.J. nonetheless testified that every withdrawal listed on her bank statements that she reviewed with the district attorney (which spanned from 2007 to early 2015) went to defendant except for some minor withdrawals. She acknowledged twice in the past entering into financial deals with other individuals that were put into written contracts that she saved. One such deal was a $22,000 car wash investment in the 1990's, and the other was a $2,300 loan to a bus driver.

## F. The Investigation and Recorded Phone Calls.

In February 2015, N.J. called the Hayward Police Department to find out information about defendant and was upset to learn he had retired in July 2013 without telling her. Defendant had said he would retire in 2018, and at that point, they would marry and add her name to the title. After

exchanging messages with the department, N.J. met with Sergeant David Dorn of the internal affairs division and told him defendant was ripping her off. After some investigation, the acting chief of police referred N.J.'s case to the district attorney's office.

In March 2015, N.J. began meeting regularly with Inspector Jeffrey Israel of the district attorney's office. Earlier, N.J. told Inspector Israel in voicemail messages that she was permanently disabled. She said that defendant knew of her disability and that she feared him. She admitted sometimes lying and being a "snoop."[12]

N.J. shared with Inspector Israel several recordings she had made of her phone conversations with defendant. N.J. explained that defendant had instructed her to use a code language in their conversations.[13] For example, when N.J. asked defendant, " 'What about the Mary deal,' " she was referring to their agreement to get married and share title to their house; the term "elixir" referred to her mortgage payment. She also told Israel that

_____

[12] Both defendant and N.J. testified regarding her habit of making harassing "crank" calls to "all kinds of people," including defendant's ex-wife. In 2015, she called his ex-wife J.B. dozens of times, day and night, while using a fake accent. She also impersonated defendant "[a]bout a dozen" in phone calls to at least one financial institution where he had a credit card account in order to obtain his personal information. Once, she called his bank and was able to learn the address of his San Mateo apartment. Intent on catching defendant in a lie, N.J. acknowledged "snooping" around in all aspects of his life despite defendant's insistence that she stop. N.J. also acknowledged lying "in my ordinary life" and at times going "to great lengths to get more money . . . ." According to N.J., "I don't have to, but I might by choice [do just about anything for $500,000]." She also described herself as permanently disabled and once diagnosed with schizophrenia.

[13] Defendant claimed N.J.'s explanations for their code words were wrong or misleading because they had multiple meanings. "Marriage" or "marry" meant putting her name on the title. He sensed during their calls that she was making false or self-serving statements to set him up.

defendant instructed her to use a blocked number when calling him, which Israel confirmed.

N.J. told Inspector Israel that their house was in Alameda, that defendant promised to add her name to the deed after he retired, and that she had seen a photograph of it. N.J. was surprised to learn from Israel that defendant's only property was in Modesto where his ex-wife and children were living. N.J. had nothing to document their property except a 2014 property tax receipt. N.J. gave Israel bank statements that reflected her cash withdrawals, which led him to conclude defendant had access to and control over her account and was stealing from her. Israel believed defendant had "no intention of ever giving her title, because he wants it to go to his kids."

Israel directed N.J. to continue to record her conversations with defendant on her cell phone.[14] Israel surveilled one particular conversation on April 9, 2015, when N.J. met with defendant at a fast food restaurant. Defendant appeared suspicious from the start and asked N.J. if she was wearing a wire. N.J. had promised to bring defendant money for the mortgage and property tax bill, which were due. Defendant, in turn, had promised to bring mortgage paperwork reflecting their balance. At the restaurant, however, N.J. told him she was done giving him mortgage money. Defendant told N.J. that he deleted the photograph on his phone of their mortgage balance because he believed she was " 'setting him up.' " N.J. asked several times for " 'the address,' " but defendant refused to give it. She lamented having no paperwork of their investment despite paying him " 'half

---

[14] The court admitted over a dozen recorded phone calls between N.J. and defendant, some made on her own and others with Inspector Israel's help.

a mil.'" Defendant replied nor did he. He also warned that if she did not pay him within 10 days their investment would be in jeopardy.

Israel continued to monitor defendant's conduct after their meeting ended and believed defendant was taking countersurveillance measures. To ensure N.J.'s safety, Israel had them both followed.

## G. The Experts.

The prosecutor and defendant each called an expert to testify regarding defendant's and N.J.'s financial transactions. Michael Woo, a forensic auditor, testified for the prosecution as an expert in certified forensic accounting. After reviewing their financial records, Woo concluded defendant received $476,457 in cash from N.J. between 2008 and 2014, a period during which defendant spent $394,589 more than he earned and N.J. claimed to have given him over $476,000.[15] In Woo's opinion, defendant got this extra money by stealing or embezzling it from N.J.

Woo acknowledged that because defendant and N.J. dealt in cash, it was "very hard" to directly correlate her withdrawals and his cash deposits. When asked whether he saw a correlation between the two, Woo responded, "Some, not all." Woo explained: "So if I see a 5,000, using your scenario, coming out of [N.J.'s] account, am I going to see a correlating deposit of 5,000 on the same day, or day or two later? Maybe, maybe not. He could deposit it in sequences. . . . It doesn't have to be one deposit, 5,000, on that day or day later. That's the gem about cash; it's liquid." Ultimately, Woo counted "[m]aybe less than a handful, at most," of times that her withdrawals could

---

[15] Defendant's expenditures during this time included $72,000 to purchase his house in 2011; $13,500 on roof repairs; $59,447 on mortgage payments from 2011 to 2014; $62,384 to pay off his credit cards; $20,000 for a used Hummer; $8,000 for a used Kia; a cash deposit on a new Land Rover; and $14,379 on gifts for his girlfriends.

be correlated with his deposits. However, defendant frequently deposited cash into his bank accounts, which Woo found "very unusual" for a wage earner. Woo also observed defendant would deposit cash in one account and then withdraw it only to deposit it in another bank account, indicating he may have something to hide. Woo also found it unusual defendant used cash to make his credit card payments. Woo opined defendant's credit union account was a "slush account" serving no purpose but to disguise his movement of money.

The defense called Michael Sullivan, a self-employed certified public accountant, to rebut Woo's testimony. Sullivan reviewed defendant's and N.J.'s financial records from 2010 to 2014, acknowledging that he lacked certain relevant information, including complete records from their PayPal accounts. Sullivan found no direct connection between N.J.'s withdrawals ($486,000) and defendant's cash deposits ($245,000) because the amounts were "so wildly different." Sullivan also found, contrary to Woo, that defendant had a modest amount of residual cash for each year from 2010 through 2014 with the exception of 2011.

Sullivan rejected Woo's expert report as based upon an incomplete or inaccurate computation of defendant's income. Sullivan believed Woo ignored defendant's retirement payments and gross payroll receipts and incorrectly assumed his alimony payments were drawn from his payroll. As a result, he believed Woo underestimated defendant's income by about $180,000.

## H.  Defendant's Former Romantic Partners.

The prosecution called five women, each of whom was one of defendant's former romantic partners, to testify regarding defendant's spending habits. The trial court instructed the jury to consider this testimony only for the limited purpose of proving how much money defendant

13

spent on his romantic partners; the details of their relationships were irrelevant.

Defendant's ex-wife J.B. testified about the couple's financial struggles, including their 1999 bankruptcy, which she attributed to his "extracurricular spending that I didn't have a say [about]." After their divorce in 2007, defendant paid her $3,000 monthly in family support. He later added $1,000 monthly so that J.B. could stay in her home. Eventually, J.B. had to sell it because the mortgage rate climbed too high.

Around 2009, while J.B. was renting property, she and defendant discussed buying another Modesto house. The plan was for defendant to buy the house and have J.B. live there rent-free until he retired and moved in, so that he could have a reliable tenant. According to J.B, in July 2011, defendant bought the Viader Drive house using cash from his online business and Reno winnings. As planned, J.B. lived there rent-free until December 2014 while defendant continued to pay support.

J.B. noticed defendant's spending increased dramatically after their 2007 divorce. He bought expensive items for their house and children, including furnishings, cars, and large cash gifts. Consistent with this testimony, four women who dated defendant after his divorce—P.P., J.L., M.H. and J.M.—testified at great length regarding his habit of lavishing them with expensive gifts. Among other things, he bought them jewelry, watches, electronics, furniture, vacations, meals and, in one case, breast augmentation surgery. Defendant also gave or offered to give money to these women; for example, he gave $1,800 to M.H. to cover her daughter's college expenses and $1,000 to J.M. for a deposit on an apartment. M.H. described defendant's habit of using cash for purchases and keeping large amounts of cash at hand. Despite the court's limiting instructions, several of these

14

witnesses testified regarding the personal details of their relationships with defendant. This included testimony from one witness that defendant broke up with her on Valentine's Day and testimony from another witness that defendant unexpectedly broke up with her on her birthday. In addition, two women similarly described defendant's discussing marriage with them just months into their relationships.

## I.    The Prosecutor's Conduct in the Trial.

This trial was by all means contentious, with multiple motions for mistrial and dismissal based primarily on charges of prosecutorial misconduct, which will be discussed at length below. Initial deliberations began on February 9, 2017, and continued over a six-day span. On February 16, 2017, a juror was dismissed for illness and replaced with an alternate juror. This reconstituted jury then deliberated at least seven more days. On March 1, 2017, the jury found defendant guilty on all counts and found true the excessive loss and aggravated white collar crime special allegations.

On March 29, 2017, the trial court sentenced defendant to an aggregate term of six years. On April 10, 2017, defendant moved to recall his sentence pursuant to section 1170, subdivision (d). On May 5, 2017, the court granted this motion and resentenced him to a five-year aggregate term. In doing so, the court set aside the jury verdicts as to the second through the ninth counts and dismissed these counts pursuant to *People v. Whitmer*, *supra*, 59 Cal.4th 733, which held that under the law existing at the time of the charged offenses (which is no longer valid law), the defendant could only be convicted of one count of grand theft where he was guilty of multiple acts of grand theft arising from a common scheme. On May 10, 2017, defendant noticed this

appeal, and on May 23 the court ordered him to pay $476,000 in victim restitution.

## DISCUSSION

Defendant seeks review of several issues, one of which we conclude requires reversal of the judgment. Specifically, the prosecutor's cumulative acts of misconduct were prejudicial on this record and entitle defendant to a new trial. Accordingly, we singularly focus our discussion on the issue of prosecutorial misconduct, which in this case consisted mainly of the following: (1) misleading the jury about whether the prosecution offered defendant a plea deal; (2) impugning defendant's character by referring to him in the jury's presence as a "dirty cop"; (3) stating before the jury that a "female judge" had found N.J.'s story credible at the preliminary hearing; and (4) insinuating that the trial judge or the court had an improper relationship with defendant. We address each of these acts in turn after setting forth the governing legal standards.

## I. Prosecutorial Misconduct.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44; see *People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

Under these standards, " ' " '[a] prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " [citation], and he may "use appropriate epithets . . . ." ' " [Citation.]' [Citation.]" (*People v. Hill*

(1998) 17 Cal.4th 800, 819.) "But, while he [or she] may strike hard blows, he [or she] is not at liberty to strike foul ones." (*Berger v. United States* (1935) 295 U.S. 78, 88.) When the alleged prosecutorial misconduct stems from the prosecutor's remarks or comments made before the jury, "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales*, *supra*, 25 Cal.4th at p. 44.)

Moreover, where prosecutorial misconduct is found, the question under state law becomes whether such misconduct was prejudicial, that is, whether it is reasonably probable a result more favorable to the defendant would have occurred if the prosecutor had refrained from the misconduct. (*People v. Haskett* (1982) 30 Cal.3d 841, 866.) Prosecutorial misconduct requires reversal under federal law unless the misconduct was harmless beyond a reasonable doubt. (*People v. Cook* (2006) 39 Cal.4th 566, 608.)

Here, defendant identifies numerous acts by the prosecutor that he contends constituted a pattern of egregious misconduct that undermined his federal and state constitutional rights to a fair trial. We describe these acts and assess their impact below.

A. *Misleading the Jury About Plea Discussions and Referring to Defendant as a "Dirty Cop."*

The prosecutor responded to an answer given by defendant on cross-examination: "And you know for a fact that I've always said I'm not pleading a dirty cop for conduct he did on duty[.]" The People acknowledge this statement was improper but insist it did no harm.

We begin with the appropriate context. Defendant testified on direct examination that he rejected a plea deal that would have released him from jail in two months because he "wanted the truth to be heard." Outside the jury's presence, the prosecutor accused defendant of lying about a plea deal

17

and stated her intention to cross-examine him on the issue. Defense counsel, in turn, noted that while there was no firm plea deal, offers had been discussed. On cross-examination, defendant mentioned a letter he wrote to the prosecutor stating that he wanted to "hear what she had to say . . . ." Defendant explained writing this letter after retired Hayward Police Officer George Torres told him a "mutual party" asked Torres to convey to him a message that the prosecutor wanted to discuss a deal. After asking defendant about this letter, the prosecutor made the statement at hand in the jury's presence—that she would not plead a "dirty cop"—after which the court sustained a defense objection, warning, "Counsel, you're testifying. You can't do that." Later, out of the jury's presence, the trial court put on the record his observation that when the prosecutor made the objected-to statement, she said "in a very loud and aggressive tone, very forceful, you know there's no way I'd plead out a dirty cop. It was a very angry tone, very, very loud voice . . . ."

The trial court took several steps to try to cure the prosecutor's impropriety. First, the court permitted retired Officer Torres to testify regarding what he had heard about a plea deal for defendant.[16] Second, the court permitted defense counsel to testify regarding an email he received

_____

[16] Retired Officer Torres testified that Sergeant James Javier asked him to convey to defendant that the prosecutor wanted to discuss a plea deal because it would be improper for Javier, as an active duty officer, to convey the message himself. Specifically, Torres testified: "[Sergeant Javier] said that [the prosecutor] asked him [at a law enforcement social event] if he could relay that information [about a potential plea deal] to Beal somehow. And he told me that he told her no, that being an active Hayward Police member, that he felt that it was a conflict of interest. Sergeant Javier then told me that she had informed him or implied that maybe he could somehow get that information to Beal. And shortly thereafter that encounter, Sergeant Javier called me and relayed me the information that I provided this Court."

18

from the prosecutor about their plea negotiations and admitted the email into evidence.[17] Last, the court struck the prosecutor's remark and advised the jury: "[The defense] made an offer of proof that they had received an email that included multiple offers . . . that directly contradicts Ms. Campbell's statement in court last week, and the email confirms the defendant's testimony that there was an offer."

The People respond on several fronts. First, they argue the prosecutor's statement about not offering defendant a plea deal was technically true because there was no "*firm* offer." Next, the People note Torres's testimony regarding what Sergeant Javier said about the prosecutor's request that a message be conveyed to defendant about a plea was inadmissible double hearsay. Last, they argue the court's ruling to strike the prosecutor's dirty cop remark and permit testimony on the plea issue erased any harm.

We reject these arguments. Regarding the veracity of the prosecutor's remark, the People claim it is "possible" she "meant to say" they had discussed offers or that she would accept nothing less than felony convictions and restitution. The jury, however, heard: "And you know for a fact that I've always said I'm not pleading a dirty cop for conduct he did while on duty[.]" We take the prosecutor's words at face value rather than, as the People suggest, retroactively assigning them a wholly speculative, benign intent.

---

[17] The court explained to the jury that "normally counsel is not supposed to testify. But you heard [the prosecutor's statement that there were no plea deals] and the defense wants to present evidence. He has the email contradicting that statement. . . . I asked the prosecutor if she wanted to accept the stipulation that that email was sent. She did not want that stipulation. So normally we don't want lawyers to testify, but [defense counsel] will be allowed to present the email, and as an officer of the court, testify to when he received it and who he received it from."

More importantly, however, the relevant standard when assessing prosecutorial misconduct is objective, not subjective. (See *People v. Hill*, *supra*, 17 Cal.4th at p. 822 [" ' "[I]njury to appellant is nonetheless an injury because it was committed inadvertently rather than intentionally" ' "].)

With respect to the People's hearsay argument, we find it misplaced. The People have not appealed the trial court's admission of Officer Torres's testimony on hearsay grounds, and the issue is therefore not before us. In any event, we are concerned here with the propriety of the prosecutor's statement, not Officer Torres's.[18]

The impropriety of the prosecutor's "dirty cop" remark was serious, violating three fundamental principles of fairness in the prosecution of criminal defendants. First, the prosecutor's remarks expressed to the jury her personal and professional belief that defendant was a "dirty cop" and therefore guilty—in the middle of trial. Indeed, spoken in the past tense ("*I've always said* I'm not pleading a dirty cop"), the prosecutor's remarks suggested to the jury that she had decided defendant was a criminal *before* he received a trial, and told him as much. (Italics added.) (See *People v. Sandoval* (1992) 4 Cal.4th 155, 183 [prosecutorial misconduct to express a personal belief in defendant's guilt " 'in part because of the danger that jurors

_____

[18] Defendant argues that Officer Torres's testimony proved the prosecutor also violated ethical rules by conveying a plea deal to him without going through his counsel. The People respond that the prosecutor told the trial court that, in fact, she had instructed Sergeant Javier *not* to convey an offer. Sergeant Javier did not testify at trial, and the trial court made no finding as to whether the prosecutor's assertion was true. On this undeveloped record and in the absence of any lower court finding, we decline to decide here whether there was any ethical violation by the prosecution in this regard.

may assume there is other evidence at his command on which he bases this conclusion' "].)

Second, the prosecutor's statement was, if not false, at minimum misleading in expressing that a plea deal was out of the question because defendant was "dirty."

And lastly, her remark strayed from the prosecutorial role of seeking truth through the questioning of witnesses and the presentation of evidence, effectively taking the stand as a *witness* and *testifying* to his guilt.[19]  Worse, in doing so she referenced an alleged out-of-court conversation she had with defendant suggesting she had inculpatory evidence to which the jury was not privy.  (See *People v. Anderson* (1990) 52 Cal.3d 453, 479 [prosecutor "is generally precluded from vouching for the credibility of her witnesses, or referring to evidence outside the record to bolster their credibility or attack that of the defendant"].)

This sort of damaging statement from the mouth of an officer of the court during the evidentiary phase of trial in front of the jury is not easily abated.  As the California Supreme Court explains, referring to facts not in evidence is " 'clearly . . . misconduct' " because such statements " 'tend[] to make the prosecutor h[er] own witness—offering unsworn testimony not subject to cross-examination.  It has been recognized that such testimony, "although worthless as a matter of law, can be 'dynamite' to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence."  [Citations.]' [Citation.]" (*People v. Hill*, *supra*, 17 Cal.4th at p. 828.)

---

[19] The People repeatedly characterize the prosecutor's statement as a "leading question."  We know of no question that begins, as this one did, with the phrase "*And you know for a fact*" then proceeds with a statement of said "fact."

21

Nor may a prosecutor " 'place the prestige of [her] office behind a witness by offering the impression that [she] has taken steps to assure a witness's truthfulness at trial.' " (*People v. Ward* (2005) 36 Cal.4th 186, 215.) Rather, a prosecutor's assurances regarding the apparent honesty—or dishonesty—of a witness must be based on the " ' "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief" . . . .' " (*Ibid.*)

Here, the prosecutor's questioning and argument took improper advantage of her position as a representative of the government to insist upon defendant's guilt in a case in which defendant vehemently denied committing any crimes.  Moreover, as we will discuss in detail below, the case against him was largely about credibility, and the two primary witnesses— defendant and N.J.—both admitted lying about a multitude of relevant facts. The fact that the jury deliberated at least seven more days after being reconstituted with an alternate juror before reaching a guilty verdict underscores the closeness of this case.  (See *People v. Rucker* (1980) 26 Cal.3d 368, 391.)  Accordingly, we agree with defendant the prosecutor's dirty-cop remark and misrepresentation regarding their plea discussions in front of the jury constituted clear misconduct.

**B.  *Testifying as to Another Judge's Opinion of N.J.'s Credibility.***

Defendant next complains about the prosecutor's "testimony" before the jury that another judge had found N.J.'s story credible.  The relevant context is as follows.  Defendant testified on cross-examination that N.J. had lied at trial when testifying she did not keep a ledger of their financial transactions. Defendant then pointed out that N.J. admitted having a ledger at the preliminary hearing before retracting her testimony and insisted that when she made her retraction "everybody [at the hearing knew] that she was

22

lying."  The prosecutor on cross-examination responded with this statement:
"Except for the judge, the female judge, right?"

The trial court, without striking the prosecutor's remark, immediately interjected, "I'll take judicial notice of the preliminary hearing.  All that's required is a strong suspicion of a crime, very low burden of proof."  Later, the court reprimanded the prosecutor for challenging defendant's testimony that N.J. kept a ledger given N.J.'s preliminary hearing testimony, noting, "It has to be corrected.  It's exculpatory evidence.  You'll be blocking exculpatory evidence . . . ."  In addition, the court belatedly (several days later) struck the prosecutor's statement, "Except for the judge, the female judge, right?"  The court then admitted and took judicial notice of the following testimony from N.J. during the preliminary hearing:

" 'Do you keep a written ledger to handle all those transactions?

" 'Answer:  For what he owed me and yes.

" 'Question:  Yes, you did keep a ledger?  And that was in regards to the property; right?

" 'Answer:  Part of it, yes.' "

On appeal, defendant contends the prosecutor was "again testifying through the guise of cross-examination, purportedly informing the jury that there had been a judicial decision in [N.J.'s] favor."  Defendant also contends the prosecutor violated her duty to disclose exculpatory evidence by suggesting to the jury that N.J. did not admit keeping a ledger at the preliminary hearing.  The People acknowledge the prosecutor's reference to the judge who presided over the preliminary hearing was improper.  The People nonetheless insist the remark was a reasonable response to defendant's testimony that "everyone in the courtroom" knew N.J. was lying

23

about having a ledger.  The People also deny the prosecutor was testifying, insisting she asked a legitimate—and harmless—" 'Isn't it true?' question[]."

As discussed above, " '[s]tatements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal.' [Citation.]" (*People v. Hill*, *supra*, 17 Cal.4th at p. 828.)  Here, the " 'supposed fact' " suggested to the jury by the prosecutor was that another judge had believed N.J.'s testimony that she was the victim of defendant's alleged crimes.  In fact, however, the judge had found only that probable cause existed to bring defendant to trial on the charged offenses.  While this legal distinction may be easily grasped by lawyers, it is not easily grasped by laypersons, even where, as here, the court admonished the jury that "a strong suspicion of a crime, [a] very low burden of proof," is required at a preliminary hearing.  The court's admonition, which was vague if not confusing, failed to explain to jurors how the "low burden of proof" at the preliminary hearing differed from the beyond-a-reasonable-doubt standard they were required to apply in this case.

As before, we cannot disregard the prosecutor's impropriety.  The evidence at trial regarding the existence of a ledger or *any form of documentation* laying out the details of defendant and N.J.'s financial dealings was hotly disputed.  N.J.'s testimony, while internally inconsistent at times, was ultimately that she kept no ledger but may have kept some receipts or scraps of paper.  Yet defendant vehemently insisted N.J. kept a ledger or notebook in which she recorded each and every one of their transactions.  On the other hand, in a recorded conversation played to the jury, defendant appeared to concede their dealings were unwritten:  When N.J. complained about having no documentation of their deal, defendant responded neither did he.

Thus, given the vastly different versions of what happened in this case presented by these witnesses, the issue of whether documentary evidence existed to collaborate either side was quite important. It was therefore misconduct for the prosecutor to tip the scales of justice by suggesting to jurors that a "female judge" believed N.J.'s story.

**C.** ***Insinuating There Was an Improper Relationship Between the Trial Court and Defendant.***

Defendant also argues the prosecutor committed misconduct by repeatedly insinuating with her words and behavior in front of the jury that the court was biased toward or had an improper relationship with him. In the clearest example of this, the prosecutor asked defendant in cross-examination, "Were you friends with a lot of judges when you were a Hayward cop?" The trial court sustained the defense's objection and asked the prosecutor if she wanted to be heard on relevance. She responded, "No." Once the jury was excused, the court expressed concern that the prosecutor had suggested it had an improper relationship with defendant: "You clearly created the impression. There's no relevance for that, to say—there was no relevance whatsoever to ask about are you friends with judges. [¶] You were standing; you made a dramatic statement about it, and the clear implication to this jury was I'm friends with Mr. Beal. That's clearly improper." The court returned to the subject the next day, labeling the incident "objective[] prosecutor misconduct" and adding that she had preceded her question with, " 'This is totally out of context.' "

Rather than address this incident head on, the People make much of the court's apparent misstatement that the prosecutor preceded her question with, " 'This is totally out of context.' " Both sides agree the reporter's transcript does not reflect that the prosecutor made this statement. The

25

record does, however, comport with the court's broader observation that her question was out of context.

Nonetheless, the People rely on the court's apparent misstatement to argue judicial bias, insisting that in "recalling dubious details, it is clear that the trial court's own feelings [toward the prosecutor] shaded its memory of what happened," as evidenced by its "many rulings favorable to [defendant]." They also note the prosecutor's own explanation for her comment, to wit, that she was not insinuating defendant and the judge were friends but merely attempting to show that defendant was using his familiarity with the criminal justice system to take advantage of it.

We begin with the obvious. It was highly improper for the prosecutor to invite the jury under the guise of questioning to infer there was any sort of improper relationship between defendant and the trial court. There was no evidence of an improper relationship between them even though the prosecutor made clear she had investigated the possibility of one prior to trial.[20] In the absence of actual evidence, the prosecutor's question raised the

---

[20] Out of the jury's presence, the prosecutor placed on the record evidence that the trial judge, former head of the district attorney's office, had given defendant at least one commendation for work he did as a police officer for the district attorney's office, once writing " 'attaboy' " on one of his personnel records. The prosecutor expressed that she had no intention of moving for recusal; she merely wanted to place this information on the record because it could give the appearance of impropriety. The trial judge responded for the record that he recognized defendant but had no specific memory or opinion of him and did not recall giving him any commendation. He further stated that giving commendations such as "attaboy" to officers was something he "frequently and continuously" did. The judge also stated that, while head of the district attorney's office, he had some contact with the Hayward police officers under his supervision but that it was insubstantial. He had previously acknowledged his son was a San Leandro police officer who had previously been with the Hayward Police Department but left due to "some conflicts there."

26

possibility that the jury would assume she had undisclosed knowledge of such a relationship. Clearly, a prosecutor, as a representative of the state, does an immense disservice to his or her office and indeed the entire legal system when, without evidence, he or she casts aspersions on the integrity of the judicial process in front of the jury. As the highest court has explained, "[the prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." (*Berger v. United States*, *supra*, 295 U.S. at p. 88.)

Although defense counsel's objection to the prosecutor's friends-with-judges question was sustained, we conclude the prosecutorial misconduct in this instance "added to the growing mountain of deceit and unethical behavior in this case." (*People v. Hill*, *supra*, 17 Cal.4th at pp. 829–830.) The court described the prosecutor's use of dramatic facial expressions, "sarcastic" and elevated tones of voice and other physical manifestations to insinuate to the jury that the court was biased against her—in this instance and a multitude of others. (See *People v. Peoples* (2016) 62 Cal.4th 718, 793 [while calling the prosecutor's behavior "unprofessional," the court stated that the use of "colorful or hyperbolic language will not generally establish prosecutorial misconduct"].) The trial court repeatedly addressed this conduct, describing for the record the prosecutor's "obvious signs of displeasure" at the court's rulings, including making faces to the jury,

"smiling," furious notetaking and other "bodily reactions that show shock and anger"—*all taking place in front of this jury*.

The court also felt compelled to make a record of the prosecutor's "threatening" and "aggressive" behavior outside the jury's presence. Indeed, at one point after the prosecutor returned to a subject matter repeatedly ruled off limits, the court appeared to reach a virtual breaking point. Directing the prosecutor to relevant legal authority, the court warned: "You can preserve your point for appeal, but you're not allowed to attack the integrity of the judge or to be complaining about the rulings after they're made."[21]

---

[21] A more complete recitation of the court's admonition is as follows: "[Y]ou continually—you accused me of being biased, and you stated at the end, 'I think I know why,' at one point.

"You're obviously threatening to me. You turned around and said, 'At least I have a witness here.' You automatically turned around and motioned to your colleague. When you made those comments, you raised your voice beyond what you normally do, very, very loud, very, very aggressive.

"You pointed your finger at me and waved it at me repeatedly. At one point while standing, you stomped your foot several times. You accused me of turning my head. I did it immediately upon—I looked away from you the moment you began attacking my judicial integrity.

"I've repeatedly warned you. You've done that repeatedly. When we've been away from the jury, you repeatedly attack my judicial integrity. Those comments are contemptuous, and I'm not going to respond to them, because you're not allowed by law to make them. So there is no reason for me to respond to them.

"There's a case I've cited already at length to you twice, *People versus Chong*, [citation]. There's also *in re Lawrence Buckley*, [citation].

" 'The settled law of the state, if an attorney commits a direct intent that impugns the integrity of the court made in open court either orally or in writing, insolence to the judge and the forward insulting words or conduct, the court has judicially recognized in the common-law as constituting grounds for contempt.

" 'The judge of the court is well within its rights to protecting his own reputation from groundless attacks upon his judicial integrity, and it is his

The People insist the court's irritation and criticism of the prosecutor's conduct simply proved it was biased in favor of defendant. Asking that we not take "at face value" the court's observations, the People accuse the court of: (1) "repeatedly admonish[ing] [her] for asking [N.J.] leading questions" while permitting defendant to "testify in practically narrative form on direct examination"; (2) "unilaterally rais[ing] discovery issues"; and (3) "repeatedly threaten[ing] to hold the prosecutor in contempt and to grant [defendant's] mistrial motions" and yet not doing so.

We reject the People's reframing of this issue as one of judicial bias somehow justifying the prosecutor's behavior in the jury's presence. At no point did the prosecution move for recusal. Instead, the prosecutor repeatedly accused the court of bias, while declining its warnings and suggestion that she file a formal motion. It is well established on appeal we presume the trial court met its duty to impartially apply the law in the absence of evidence to the contrary. (*People v. Asghedom* (2015) 243 Cal.App.4th 718, 725.) As this court advised: "[I]f the ruling is adverse, it is

---

duty to protect the integrity of the court. However willing he may be to forego the private injury, the obligation upon him by his oath to maintain the respect due to the court in which he presides.'

"Also, *Sacher versus United States*, 343 US 1, at page 9. 'If the ruling is adverse, it is not counsel's right to resist it or to insult the judge. His right is only respectfully to preserve his point for appeal.'

"You can preserve your point for appeal, but you're not allowed to attack the integrity of the judge or to be complaining about the rulings after they're made. There's numerous insults. One of which is you stated on the record here, 'Everyone says you knocked this off Tom Rogers.' That was an insult.

"Also, you're to act respectfully. In court you've had continually insolent and rude behavior by consistently making faces, expressing obvious exasperations by rulings of the Court or admonishment not to ask leading questions." (*Sic.*, italics added.)

29

not counsel's right to resist it or to insult the judge—his right is only respectfully to preserve his point for appeal." (*Sacher v. United States* (1952) 343 U.S. 1, 9.)

Accordingly, we stay focused on the prosecutor's conduct rather than the court's. Well-established rules of professional conduct dictate (among other things) that a prosecutor " 'should support the authority of the court and the dignity of the trial courtroom by strict adherence to the rules of decorum and by manifesting an attitude of professional respect toward the judge, . . . defendants . . . and others in the courtroom,' " and " 'comply promptly with all orders and directives of the court, [while maintaining his or her] duty to have the record reflect adverse rulings or judicial conduct which he [or she] considers prejudicial.' " (*People v. Hill*, *supra*, 17 Cal.4th at pp. 832–833, citing ABA Project on Stds. for Crim. Justice, Stds. Relating to The Prosecution Function and The Defense Function (approved draft 1971) (hereafter ABA Standards), std. 5.2(a), (d).) Moreover, it is " 'unprofessional conduct for a prosecutor to engage in behavior or tactics purposefully calculated to irritate or annoy the court . . . .' " (*People v. Hill*, at p. 832,, citing ABA Standards, std. 5.2(c).) " 'The gravity of the human interests at stake in a criminal trial demands that the proceeding be conducted in an orderly and dignified manner. . . . [¶] Rudeness and intemperance have no place in any court, especially in the relations between its professional members, the judge and lawyers.' (ABA Standards, *supra*, com. to std. 5.2, pp. 113–114; [citation].)" (*People v. Hill*, at p. 833.) The prosecutor's behavior toward the trial court and defendant in front of the jury violated these professional standards.[22]

---

[22] Defendant argues the prosecutor engaged in further misconduct through her improper introduction of highly prejudicial evidence, including

## II. The Impact of This Misconduct Was Prejudicial.

We are convinced the prosecutor's multiple acts of misconduct constitute prejudicial error under California law, as it is reasonably probable a jury would have reached a result more favorable to defendant absent her objectionable behavior. (Cal. Const., art. VI, § 13; *People v. Haskett*, *supra*, 30

---

an exhibit consisting of a photograph of N.J. with the inflammatory hearsay caption " 'Beal's ex-wife!' " and evidence of N.J.'s alleged mental illness. We find no misconduct here.

With respect to the prosecutor's introduction of evidence relating to N.J.'s mental illness or disability, in fact, defense counsel first introduced such evidence when questioning N.J. about whether she told Inspector Israel that she was permanently disabled and that defendant knew it. Defense counsel later questioned N.J. about whether she had submitted a doctor's letter with a diagnosis of mild depression in an application for a discounted bus pass. While the parties may have used evidence of N.J.'s mental health for distinct purposes—defendant to paint her as someone who used sham diagnoses for her own benefit (e.g., to obtain a discounted bus pass) and the prosecution to paint her as a vulnerable and unsophisticated target for defendant's crimes—the prosecutor's use of this evidence was not wrongful. As the parties' briefs illustrate, the evidence of N.J.'s mental health was relevant not just to her credibility as a witness but also to defendant's motive when engaging her in financial dealings.

Turning to the prosecutor's introduction of allegedly improper hearsay, the record reflects she questioned Inspector Israel about a photograph of N.J. standing outside of defendant's parked car with him seated inside that was attached to an email sent by Steve Brown with the caption: " 'Beal's ex-wife,' exclamation point." Defense counsel moved for mistrial, and the court expressed concern that defendant had been ambushed by this evidence. The court denied the motion but struck the photograph and caption as hearsay.

This evidence is clearly inflammatory. However, the prosecutor had at least a colorable argument that the photograph and caption were not offered for their truth and were relevant to N.J.'s claims that she and defendant had oral sex hundreds of times and that he had promised to marry her and move her into their house after he retired. Moreover, the trial court sustained defendant's hearsay objection and struck the evidence, thereby curing its potential prejudice. The defendant's indirect challenge to this evidence as prosecutorial misconduct is thus misplaced.

31

Cal.3d at p. 866; *People v. Herring* (1993) 20 Cal.App.4th 1066, 1074.) The principal witnesses, defendant and N.J., had wildly divergent accounts of their financial dealings. Yet there was no documentation proving either witness's account despite the number and scope of their transactions, aside from bank statements reflecting withdrawals and deposits that may or may not have been connected depending on which expert one believed. As such, the prosecutor's misconduct cut to the very heart of this case: Was N.J. a quirky and cunning but no doubt shrewd investor or a mentally unstable and vulnerable victim of a manipulative cop? Even if we were to conclude the harm arising from any one act of misconduct was harmless or likely cured by the court's responsive measures, we remain concerned with the cumulative impact of the prosecutor's actions. (*People v. Herring*, at p. 1075; *People v. Bell* (1989) 49 Cal.3d 502, 533–534.)

Despite conceding multiple acts of misconduct, the People insist any cumulative impact was insignificant. They rely on a collection of supposedly "overwhelming" evidence of defendant's guilt that included: (1) bank records reflecting N.J.'s withdrawals of $476,000 in cash as compared to the records of defendant's deposits and expenditures; (2) testimony exposing defendant's numerous lies about the nature and number of his financial dealings with N.J., including his lies about the property's Modesto location and why he kept her name off the title; (3) testimony relating to his "extravagant spending"; and (4) evidence of his "fictitious investments and frauds" that proved his criminal intent, including his use of a "gift letter" executed by a former girlfriend to make the property down payment and his false statement on the loan application that no one else could claim an interest in the property.

The People's analysis omits key parts of the record less favorable to their case. For example, the evidence does reflect that N.J.'s cash

32

withdrawals totaled approximately $476,000 over a seven-year period. However, experts Woo and Sullivan disagreed about fundamental facts, including whether defendant spent approximately $395,000 more than he earned during this time frame (Woo) or had a modest amount of residual cash (Sullivan). Woo and Sullivan also disagreed about defendant's total income during the relevant time, with Sullivan opining that Woo underestimated defendant's income by about $180,000. Both experts agreed, however, that would be very hard to directly correlate N.J.'s withdrawals and defendant's deposits or expenditures.

Moreover, the prosecution's theory hinges on a claim that N.J. gave *all* of the cash she withdrew to defendant, not spending any on herself or anyone else aside from a modest amount for her essentials. N.J. no doubt preferred to deal in cash (as did defendant). However, the evidence did not necessarily require a finding that all of her cash went to defendant. According to Inspector Israel, N.J. told her banker that she was withdrawing money at various times to pay for her house, her mother's car and surgery, not to invest with or loan to defendant. Further, Woo himself testified when opining that defendant stole from N.J. that an individual that deals strictly in cash "tends to have something to hide." To the extent Woo's observation bears truth, it likewise applies to N.J.

Further muddying the waters, as we have already discussed, there was not a single receipt or other shred of documentary evidence linking any particular withdrawal made by N.J. to an expenditure or deposit made by defendant. And yet there was evidence that when N.J. entered into investments other people, she kept a signed contract or other written record.

We agree with the People the property deal between defendant and N.J. was wholly one-sided in his favor. Yet, again, this evidence does not

33

necessarily require a finding of guilt on the nine charged offenses. Defendant and N.J. actually agreed on numerous aspects of their deal, including N.J.'s half-ownership of the house and her willingness not to know the address or not to have her name on the title. While to the average person this no doubt seems odd, N.J. herself acknowledged wanting to structure the deal this way—even suggesting they use a " 'C' corporation" to maintain their privacy—in order to access defendant's credit. Thus, while a wealth of evidence supported the prosecutor's theory that N.J. was victimized by defendant, the evidence could also support a view that N.J. was a shrewd investor capable of amassing over $400,000 in her bank account while working on the streets as a sex worker and in other menial jobs, including panhandling and doing surveys.

As to the overwhelming evidence of defendant's lies and questionable business dealings, equally overwhelming was the evidence of N.J.'s lies, including her own admission that she lies in her everyday life. In addition, there was substantial evidence that N.J. gamed the system by, for example, obtaining a sham medical diagnosis to qualify for a discounted bus pass; impersonated people over the phone and on social media to obtain bank and other information about defendant; and harassed people (including defendant's ex-wife) with crank phone calls. The evidence of lying and deceit thus runs both ways.

Finally, we agree with the People there was a wealth of evidence that defendant had an extravagant lifestyle and excessive spending habits. But this evidence in and of itself did not prove that he committed any of the charged crimes. Simply put, overwhelming evidence that defendant lived far beyond his means cannot, by itself, be equated with overwhelming evidence that he committed nine specific counts of felony grand theft.

The People refer to comments by the trial court describing the evidence of defendant's guilt as " 'overwhelming' " and opining there was " 'no question that, in fact, he embezzled, he stole.' "  However, the trial judge also said he had "never seen [such conduct] by a defense attorney or a prosecutor in my over 40 years.  It's unbelievable."  When defendant moved for a mistrial, the court acknowledged it had "seriously consider[ed]" ordering one "throughout" the trial, and yet decided against it, reasoning:  "[Defendant]'s been in custody 19 months.  It's a very difficult trial to have to do over again.  It would also be unfair.  I don't know where the money is coming from for his defense."  Similarly, when considering a defense motion for dismissal the court stated, "I've never seen such egregious conduct, and so it is a denial of due process."  Nonetheless, the court denied the motion, noting that a dismissal "won't let him clear his name."

As this record reflects, the court was deeply troubled by what went on during this trial, notwithstanding its apparent opinion that there was substantial evidence that defendant " 'embezzled, he stole.' "  Importantly, however, the trial court was not the trier of fact.  It was the jury called upon to determine whether defendant was guilty beyond a reasonable doubt *as to each of the charged counts*—after he received a fair trial.  The trial court's off-the-cuff comments about the weight of the evidence are therefore not determinative.

At the end of the day, for the reasons stated, we conclude the prosecutor violated state law by using " ' " 'deceptive or reprehensible methods' " ' " in attempting to persuade this jury of defendant's guilt.  (*People v. Samayoa, supra,* 15 Cal.4th at p. 841; *People v. Hill, supra,* 17 Cal.4th at p. 845.)  Some of her actions were simply mean-spirited and unprofessional; others constituted betrayals of the trust placed in her as a public prosecutor

tasked with seeking the truth rather than obtaining a conviction at all costs. While it is true defense counsel objected to the most egregious instances of her misconduct and the trial court adopted broad curative measures that no doubt diminished the prejudice, the breadth and consistency of her misconduct, we fear, impacted the jury's ability to remain impartial. The fact that the reconstituted jury deliberated at least seven more days before reaching a guilty verdict underscores the closeness of this case.

Accordingly, we conclude there is a reasonable probability that absent the prosecutor's repeated acts of misconduct the jury might have reached a different result. (*People v. Hill, supra,* 17 Cal.4th at pp. 845–846 [" ' "You can't unring a bell" ' "]; *People v. Bain* (1971) 5 Cal.3d 839, 849 [under the circumstances where the alleged perpetrator and alleged victim were the sole or primary witnesses and their testimony was "in sharp conflict," there was a "grave danger that misconduct of counsel may [have] tip[ped] the scales of justice"].) Reversal is necessary to ensure defendant is afforded due process.

Given this result we need not address defendant's remaining arguments, which are either moot or unlikely to recur in a new trial in their present form.[23]

---

[23] In the parties' briefs, it was agreed that the issue of the admissibility of the over a dozen recordings of N.J.'s phone conversations with defendant hinged on the applicability of Proposition 8, approved in 1982. On December 19, 2019, the high court decided *People v. Guzman* (2019) 8 Cal.5th 673, which held that the state constitutional right to truth in evidence under California Constitution, article I, section 28, subdivision (f)(2) abrogated the prohibition in section 632, subdivision (d) against the admission of secretly recorded conversations in criminal proceedings because, inter alia, the statute did not fit within any express exception and the state constitutional right to privacy was not affected. Accordingly, should this issue arise again upon retrial, the trial court will have the benefit of this new binding precedent. Further, with respect to the court's admission of testimony from defendant's former romantic partners, defendant concedes it was relevant so

## DISPOSITION

The judgment is reversed.  The matter is remanded to the trial court for a new trial.

---

long as limited to his expenditures of money.  The court erred, he contends, by permitting these witnesses "to testify at length, and emotionally, about their unhappy relationships with [him]."  If this issue arises again on retrial, defendant may propose more appropriate limits on their testimony.

_____

Jackson, J.


WE CONCUR:


_____

Siggins, P. J.


_____

Fujisaki, J.


A151336/*People v. Michael Scott Beal*

38